PABST and another, Appellants (PABST and another, Execu-
tors, Respondents), vs. GOODRICH and others, Appel-
lants, and PABST, Respondent.

*September 7—October 15, 1907.*

*Wills: Construction: Concurrent jurisdiction of circuit and county
courts: Supreme court: Jurisdiction on appeal: Corporations:
Purchase of their own stock: Effect: Distribution of corporate
stock under will: When considered corpus and when income:
Power of corporation over its own stock: Executors and trus-
tees: Investment of estate.*

1. A circuit court of this state has plenary jurisdiction of actions
   to construe wills and aid executors in the execution of trusts
   thereunder, and where important questions are presented to be
   determined in advance of distribution, executors are entitled
   to the protection of that court; and the fact that the same
   questions may arise in the county court on distribution is no
   objection to their determination when presented to the circuit
   court in an action for construction.
2. In such cases the jurisdiction of the supreme court on appeal
   from the judgment of the circuit court determining such issues
   cannot be questioned.
3. In construing a will each paragraph thereof should be given
   such force and effect as to harmonize the whole instrument
   and permit all parts to stand together.
4. In construing a will it is the duty of courts to ascertain the in-
   tention of the testator, if that can be determined from the
   instrument itself, and in seeking out that intention words are
   to be given their plain and ordinary meaning.
5. Provisions of a will, stated in the opinion, are *held* to show an
   intention that a designated beneficiary should receive her sup-
   port and education during the life of testator's widow and
   come into possession of her income on attaining her majority,
   provided the widow should live until that time; but, in case
   of the widow's death before the beneficiary attained majority,
   the beneficiary should receive the annual income on her portion
   from the time of the widow's death.
6. A corporation, being solvent, has the right to purchase and hold
   its own stock, keep it alive and treat it as assets, and such
   purchase does not amount to a cancellation of the stock pur-
   chased.

7. A testator by his will provided that one beneficiary should receive shares of a corporation sufficient to make $1,000,000 book value, he having transferred by way of gift a like amount in book value of the stock to each of the other residuary beneficiaries contemporaneously with the making of his will. It appeared, among other things, that the corporation had purchased shares of its own stock, which it had kept alive and treated as assets before the testator, who was the principal stockholder and knew its method of doing business, made his will. *Held*, for the purpose of distribution, that the designated beneficiary should receive shares of the total capital then outstanding, and that the shares of stock purchased by the corporation should be regarded as outstanding and corpus of the estate and not income.

8. A testator by his will provided that one beneficiary should receive shares in a corporation sufficient to make $1,000,000 book value. It appeared, among other things, that the corporation, to the knowledge of the testator, who was its principal stockholder, had purchased its own stock which it had kept alive and treated as assets, designating it as "treasury stock." After the testator's death the directors of the corporation by resolution distributed this "treasury stock" as a stock dividend. *Held*, that the so-called "treasury stock" was a part of the principal or assets of the corporation and not income, and passed to the different legatees as corpus of the estate.

9. In such case it was *held* to be beyond the power of the corporation, after the death of testator, to change the character of the stock owned by the testator so as to divert it into channels not contemplated by him.

10. A testator by his will gave his executors and trustees power and authority to manage and control the property "according to their judgment and discretion, and to sell and dispose of any portions thereof, including any real estate. . . . And I further give them full authority to invest the trust properties in such manner as they shall deem best, with no responsibility for losses, provided they act honestly and in good faith." One beneficiary, by her pleading, alleged that she had requested the executors to loan to her a portion of the trust estate by them held in trust for the benefit of herself and children upon her personal obligation, secured by stocks and bonds of a corporation of Germany, owned by her husband and members of his family, and that the executors were ready to make such loan, provided they were satisfied with the security and had power under the will to make it. *Held*, that the testator, by

the language used, intended that the executors in exercising their judgment should exercise it as trustees bound to secure a safe, and not a hazardous, investment and within the jurisdiction of our courts and not in a foreign land, and hence that they had no power to make the investment.

11. Powers of investment given executors and trustees under a will must be held to give them à reasonable and not an arbitrary discretion, and imply a duty to execute the trust in accordance with existing laws governing trustees in the execution of their trust.

12. Under power to make investments trustees are bound to act in good faith and exercise a sound judgment and prudent discretion, and are bound to look to the interests of the remainder-man as well as those of the life tenant, and place the trust estate in no hazardous position.

13. While the general rule that investment of trust estates should be made within the court's jurisdiction is subject to exception, yet executors have no power to invest trust funds beyond the jurisdiction of the court in the absence of express authority to do so.

14. Except as modified by statute (ch. 317, Laws of 1903) the supreme court has followed the rule that a trustee can only protect himself against risk by investing trust funds in real estate and government securities or in a fund approved by the court.

APPEALS from a judgment of the circuit court for Milwaukee county: J. C. LUDWIG, Circuit Judge. *Affirmed.*

This action was brought in the circuit court for Milwaukee county to construe the will of Frederick Pabst, late of the city of Milwaukee, Wisconsin. The action was commenced by *Gustave G. Pabst* and *Frederick Pabst, Jr.,* individually and as surviving executors under the last will and testament of Frederick Pabst, deceased, against *Maria Goodrich, Emma Soehnlein, Edith Soehnlein,* and *Beatrice Soehnlein,* children of *Emma Soehnlein,* and *Maria Pabst,* commonly called *Elsbeth Pabst.* The complaint sets out the death of Frederick Pabst January 1, 1904, and the execution of his will July 17, 1903; that letters testamentary thereon were issued February 3, 1904, to the plaintiffs *Gustave G. Pabst, Frederick*

*Pabst, Jr.,* and Maria Pabst; that Frederick Pabst left, him surviving, next of kin, Maria Pabst, his widow, who died October 3, 1906, *Gustave G. Pabst* and *Frederick Pabst, Jr.,* his only sons, *Maria Goodrich,* his daughter, who at the time of the testator's death had issue living, *Emma Soehnlein,* his daughter, who at the time of testator's death had issue living, to wit, *Edith Soehnlein* and *Beatrice Soehnlein,* and *Emma Maria Pabst,* granddaughter, commonly called *Elsbeth Pabst,* and only issue of deceased daughter, Elsa Von Ernst. The complaint further alleges that after providing for gifts made to Maria Pabst, widow of testator, there remained in the hands of the plaintiffs, as surviving executors, a large amount of real and personal property held under the trusts of said will, and that the following questions have arisen touching the proper construction of the will:

*First.* Whether, since the death of Maria Pabst, widow of said deceased, the annual income of the remaining part of testator's estate, mentioned in the sixth article of his will, shall be paid to said *Elsbeth Pabst* during her life, and to her issue in case of her death, as provided in the sixth article of said will, or divided in equal shares among the testator's children, *Gustave G. Pabst, Maria Goodrich, Frederick Pabst, Jr.,* and *Emma Soehnlein,* or their respective issue, until said *Elsbeth Pabst* shall arrive at the age of twenty-one years, as provided in the third article of said will. *Second.* What number of shares of the capital stock of the Pabst Brewing Company represents a book value of $1,000,000, according to the regularly kept books of said Pabst Brewing Company, as provided in the fourth article of said will? *Third.* Whether the stock dividend hereinafter mentioned is principal or income of the trust estates created by said will respectively. *Fourth.* Whether the executors, under the authority to invest conferred by the ninth article of said will, have power to make the investments hereinafter mentioned.

The first and second items of the will gave the widow cer-

tain property and the annual sum of $50,000 to be paid to her during her life. The will further provides:

"*Third.* Subject to the above provisions, I give, devise, and bequeath all the property which I may have at the time of my decease, or be in any way interested in, to my executors, in trust, during the life of my said wife, the trustees out of the income of said property to pay her said sum of fifty thousand dollars ($50,000) per annum; and also out of said income or said property to them conveyed to pay all proper expenses for the suitable support and education of my granddaughter and adopted daughter, *Emma Maria Pabst,* commonly called *Elsbeth Pabst,* until she shall arrive at the age of twenty-one years, and to divide the net income of said property after said payments, annually or at such times as may be convenient, in equal shares, among my children *Gustave G. Pabst, Maria Goodrich, Frederick Pabst, Jr.,* and *Emma Soehnlein,* or their respective issue; in case of the death of any of them, such issue to take a parent's share by right of representation. In case any of my said children shall die without leaving issue, such income shall be divided among the remaining children or their issue.

"At her arrival at the age of twenty-one years said *Elsbeth* shall take an equal share with the other of said children in said distribution of income, subject to the same conditions above provided.

"*Fourth.* Upon the decease of my said wife the entire estate shall be divided into as many parts as there are children then living, counting the living descendants of any deceased child as the representative of its parent in case of the latter's decease. Said parts shall be equal, except that there shall be transferred to one of said parts, designed for the benefit of my granddaughter, *Elsbeth,* as provided in paragraph sixth of this instrument, such number of shares of the capital stock of the Pabst Brewing Company as shall represent a book value of one million dollars, according to the regularly kept books of said Pabst Brewing Company, so that said part shall exceed each of the other parts by the amount of said shares of stock. The reason for this discrimination is that I transfer, by way of gift, a like amount in book value of said stock for the benefit of each of my children, *Gustave G. Pabst, Maria*

*Goodrich, Frederick Pabst, Jr.,* and *Emma Soehnlein,* con-
temporaneously with the making of this will.

"One of said equal parts shall be paid over and transferred
to my son, *Gustave G. Pabst,* or his heirs; one to my daughter,
*Maria Goodrich,* or her heirs; and one to my son, *Frederick
Pabst, Jr.,* or his heirs.

"*Fifth.* In case my said daughter, *Emma Soehnlein,* shall,
at the time of the decease of my wife, have a child or children
living, such child or the oldest of such children being not less
than ten years of age, then and in such case said *Emma Soehn-
lein* shall also be entitled to and receive one of said equal parts
of my estate.

"If at the time of the decease of my wife said *Emma
Soehnlein* shall have no living issue, or her issue shall not
have attained the aforesaid age, then said part of my estate
shall continue to be held in trust by my executors and trustees,
said *Emma* receiving the income thereof until a child of said
*Emma,* either living at the time of my wife's decease or there-
after born to her, shall arrive at the age of ten years, where-
upon, such child being living, said *Emma* shall become en-
titled to and receive said one part of my estate.

"In case said *Emma* shall not have a child of said age at
the time of my wife's death, and no child of hers shall, after
that time, reach said age, then said part of my estate shall
continue to be held in trust by my executors and trustees
during the life of said *Emma,* and the income thereof annu-
ally paid to her, and the body or principal of said part shall,
in such case, upon her decease, go in equal shares to my other
children or their respective issue in the same manner and sub-
ject to the same conditions herein provided in reference to
the other parts of my estate.

"In case said *Emma* shall die leaving a child or children
before the transfer to her of said part of my estate pursuant
to the provisions hereof, the net income of said part shall
thereafter be paid to such child or children in equal shares
until the oldest thereof shall attain the age of twenty-one
years, whereupon said part shall be transferred and paid over
to such child or children in equal shares. In case all of said
children shall die before reaching said age and without leav-
ing lawful issue, said part of my estate shall be disposed of
in the same manner as if said *Emma* had died without leav-

ing surviving issue. If issue of any child survive it shall take by representation what its parent would have taken if living.

"*Sixth*. The remaining part of my estate, being the one increased by the transfer thereto of shares of stock as hereinbefore provided, shall, upon the decease of my wife, continue to be held in trust by my executors and trustees, provided said *Elsbeth* be living at that time; and the annual income thereof shall be paid to said *Elsbeth* during her life.

"In case of said *Elsbeth's* death without leaving issue surviving her, said part of my estate shall be added in equal shares to the remaining shares thereof and disposed of as parts thereof as hereinbefore directed.

"If said *Elsbeth* shall have died prior to the decease of my wife, leaving a child or children who shall survive my wife; or if she shall die after my wife's death, leaving a child or children,—then also said part of my estate shall continue to be held in trust by my executors and trustees, and the annual income thereof shall be paid to such issue in equal parts for the term of twenty-one years after the death of said *Elsbeth,* and shall thereupon be paid to such child or children and the issue of any of them who may have died, according to the rule of representation.

"In case of the death of said *Elsbeth* without leaving issue surviving her, or the extinction of her issue prior to the expiration of twenty-one years from the time of her decease, said part of my estate shall be added in equal shares to the other parts as herein directed and pass to my other said children or their respective issue or heirs, subject to the same conditions and limitations herein prescribed as to said other parts.

"In case said *Elsbeth* shall attain the age of forty-five years and shall then have living a child or children, the whole of said part of my estate shall pass and be transferred to her.

"*Seventh*. In making distribution both of the income and the principal of my estate as above directed, advancements heretofore made by me to any of my children and charged against them on my private books shall be taken into account and charged respectively against the share of the child to whom they were made, reducing such share by the amount thereof. This provision, however, shall not apply to certain

shares of stock of the Pabst Brewing Company which I have heretofore made over by way of gift to my sons, *Gustave G. Pabst* and *Frederick Pabst, Jr.*

"*Eighth.* I give to my wife, at her option, in lieu of the aforesaid fifty thousand dollars ($50,000) per annum, an equal one-sixth share of my entire estate, such option to be exercised by her in writing within one year from the time of my death. In case she shall so exercise this option my executors and trustees shall, instead of paying to her said fifty thousand dollars ($50,000) per annum, pay to her the income of such one-sixth of my estate and transfer and make over to her the body or part thereof whenever she may so request. This my will to remain in other respects unaltered, and such portions of such one-sixth share as she may not have requested to be transferred to her to pass as part of my estate as herein provided.

"*Ninth.* I nominate and appoint my beloved wife, Maria Pabst, and my sons, *Gustave G. Pabst* and *Frederick Pabst, Jr.,* executors of this my will and trustees of the trusts thereby created; and I hereby confer upon said executors and trustees full power and authority to manage and control said property according to their judgment and discretion, and to sell and dispose of any portions thereof, including any real estate, also said homestead, during the life of my wife if she shall desire it and consent thereto. And I give them full authority to invest the trust properties in such manner as they shall deem best, with no responsibility for losses, provided they act honestly and in good faith.

"In case any of said executors or trustees shall die, the surviving two shall have authority to nominate a successor, who shall be clothed with the same authority as was enjoyed by the deceased executor or trustee; provided, that until the legal appointment of such third executor or trustee, the survivors shall have full power and authority in all respects to act under the provisions of this will.

"I request that no bonds be required from my said executors or trustees. And I direct that no inventory of my estate shall be required to be filed in the county court or any public office; but it shall be the duty of said trustees to keep, for the benefit of all parties interested in my estate, full and accurate books of account of my said estate and all their dealings therewith."

The court found, substantially: That after the payment of the gifts and bequests mentioned in the will there remained in the hands of the executors a large amount of property of the estate, including 1,918 shares of the capital stock of the Pabst Brewing Company, each share being of the par value of $1,000, and the total authorized capital stock being 10,000 shares. That 2,840 shares had been transferred by deed of gift dated July 17, 1903, to trustees for the benefit of plaintiffs *Gustave G. Pabst, Frederick Pabst,* and defendants *Maria Goodrich* and *Emma Soehnlein,* one fourth to each, with remainder of share of *Emma Soehnlein* to go in certain contingencies to her children, *Edith* and *Beatrice Soehnlein,* the deed expressing that the gift to each was substantially $1,000,000. That *Emma Maria Pabst* was born December 25, 1890, and was regularly adopted by testator and his wife as their child, and lived with Maria Pabst until her death, and has since lived in the family of plaintiff *Gustave G. Pabst.* That on October 3, 1906, the assets of the Pabst Brewing Company, deducting debts but not capital stock, were $15,098,345.12, which included 3,322 shares of the Pabst Brewing Company stock which had been purchased prior to that date and paid for out of the assets of the corporation or secured by obligations of the corporation and a mortgage upon certain of its property, and said 3,322 shares were figured in the assets at par, so that on said date, apart from the 3,322 shares, its net assets were $11,776,345.12. That the shares were purchased at a premium over par, the aggregate amount of purchase price being $4,495,624.89, which was less than the net book value of said shares, but exceeded its par value by $1,173,642.89. That on October 3, 1906, the book value of each share of said stock was as follows: If the whole 10,000 shares were to be treated as outstanding, and said premium so paid for the shares so purchased by the company is added to its assets, $1,627.1989; and 614.5502 shares would equal book value of $1,000,000. If only 6,678 shares were to be treated as outstanding, $1,763.4540; and 567.0689 shares

would equal book value of $1,000,000. That on December 11, 1906, the 3,322 shares of stock purchased by the Pabst Brewing Company were distributed as stock dividend pursuant to a resolution of the company. That such dividend was not distribution of profits so as to be a dividend strictly so called as between tenant for life of any of the shares of the stock and remaindermen, but was a redistribution of the purchased shares of stock as representing permanent capital of the corporation. That the 3,322 shares of stock purchased and retained by the Pabst Brewing Company on October 3, 1906, had been acquired and held as follows: 280 shares thereof had been purchased for cash prior to the death of the testator, Frederick Pabst, and prior to July 17, 1903, at a price aggregating $373,732.89, which was less than the book value thereof. Prior to July 17, 1903, and when the purchase of such stock was commenced, an account was opened on the books of the Pabst Brewing Company denominated "treasury stock account," to which from time to time, as stock was purchased, $359,310.08 was charged, being the purchase price of all of said 280 shares, excepting ten shares thereof purchased January 14, 1901, of Louis W. Falk, at $14,422.81, which amount was charged to an account denominated "Frederick Pabst, trustee;" and credits were made to the appropriate accounts on the books of the Pabst Brewing Company to offset such debits, and to represent the cash paid for the acquisition of said 280 shares, and the outstanding certificates for such shares of stock were surrendered by the vendors thereof and canceled, and certificates in lieu thereof in the usual form issued for said 280 shares, as follows: For 261 shares to the testator, Frederick Pabst, as trustee, and for the remainder to *Gustave Pabst* as trustee, and said certificates were in turn indorsed in blank by said Frederick Pabst as trustee and *Gustave Pabst* as trustee, and deposited with said corporation. That twenty-four shares of its stock were purchased by the corporation on April 19, 1906, at $1,355 per share, and on June 29, 1906, 3,018 shares of stock were pur-

chased at $1,355 per share, and the certificates for said 3,042 shares were surrendered and canceled by the vendors thereof, and in lieu certificates for the same issued by the corporation under its seal and signed by its proper officers to said *Gustave Pabst* as trustee, and indorsed by *Gustave Pabst* as trustee and deposited by him with the corporation; and the purchase price of said twenty-four shares was paid in cash, and the purchase price of said 3,018 shares was paid by said Pabst Brewing Company, $600,000 in real estate of said corporation conveyed to the vendor, and the remainder by the proceeds of a loan made upon bonds issued by the corporation, secured by a mortgage incumbering all of its real estate, plant, and fixtures, including real estate in the states of Connecticut, Illinois, Iowa, Kentucky, Massachusetts, Michigan, Minnesota, Missouri, Nebraska, New York, Ohio, territory of Oklahoma, Virginia, and West Virginia. Such mortgage provided that upon the contingency of default in payment it might become a lien upon all the other property and assets of the corporation in addition. And such bonds were in the aggregate amount of $3,500,000, of which $500,000 bear interest at five per cent. per annum, and $3,000,000 at the rate of four per cent. per annum, which bonds are still outstanding and unpaid. That in its system of bookkeeping the Pabst Brewing Company at all times kept upon its books an account denominated "surplus account," to which was credited the value of its accumulations in the form of real estate, machinery, supplies, additions to its plant, and other assets, in excess of the amount of its capital stock; and the total amounts credited to such account upon the dates hereinafter set forth were as follows:

| | |
|---|---|
| January 1, 1904.................................... | $4,810,728 60 |
| January 1, 1905.................................... | 4,347,634 46 |
| January 1, 1906.................................... | 5,753,386 36 |

That this surplus, though it represented earnings and accumulations of the corporation over and above the amount of the capital stock, was never in the form of accumulated earn-

ings in cash, but in the form of extensions and increase of the property and assets of the corporation actively used as part of the capital of its business and in the prosecution of its business. That the purchase price of the twenty-four shares bought April 9, 1906, namely, $32,520, was on such date charged to the aforesaid treasury stock account; and on June 29, 1906, the amount of the par value of the 3,018 shares purchased on such date, namely, $3,018,000, was charged to said treasury stock account, and appropriate credits were made to other accounts to offset such debits of April 9, 1906, and June 29, 1906, and the premium paid upon such purchase of 3,018 shares, namely, $1,071,390, was charged, instead of to treasury stock account, to the aforesaid surplus account; and on the same date, June 29, 1906, the treasury stock account was credited and the surplus account debited with $87,830.08, being all, except $14,422.81, of the price over and above par which had been paid for the 280 shares purchased prior to the death of the testator, and for the twenty-four shares purchased April 9, 1906, leaving the treasury stock account from and after June 29, 1906, and on October 3, 1906, and down to and until December 11, 1906, debited with $3,322,000, the par value of the stock theretofore purchased. That on October 1, 1906, there was further charged to surplus account and credited to the account of Frederick Pabst, trustee, the sum of $14,422.81, being the amount paid for ten shares purchased of Louis W. Falk on January 14, 1901. On October 3, 1906, the net amount credited to the surplus account was $5,098,346.12, which was the net amount credited to such account after such account had been debited with the $1,173,642.89 premium paid upon the 3,322 shares of stock purchased as aforesaid. That said Pabst Brewing Company at all times, by its method of treatment of the 3,322 shares of purchased stock, regarded and held the same as part of its assets, and at all times prior to December 11, 1906, elected to treat the same as in force

and effect and as outstanding, and, if such purchased shares be regarded as outstanding and as among the assets of the corporation, its entire capital and surplus, according to its books, would, upon October 3, 1906, amount to the sum of $16,271,989.01. That said testator was for many years prior to his death an officer, to wit, president, of the Pabst Brewing Company. That the Pabst Brewing Company from and after January 1, 1903, declared and paid dividends in cash upon its stock, which dividends were debited to the surplus account, and such dividends aggregating ten per cent. were declared in each year during the period from January 1, 1904, to October 3, 1906, upon the full amount of 10,000 shares of stock of the company as outstanding, and such dividends, in the aggregate amount of $1,000,000, were charged to the surplus account, and each dividend was actually paid to the proper stockholder upon the stock other than that which had been at the time of the dividend purchased by the Pabst Brewing Company as aforesaid. That though in the resolution of the directors of the company adopted December 26, 1906, it is recited that profits to the amount of $1,990,578.56 had been earned and retained by the company since January 1, 1904, the amount of profits earned and retained by the company since January 1, 1904, and up to and including October 3, 1906, was in reality only $1,590,578.56, and the increase of surplus over and above dividends paid was in each year from January 1, 1904, as follows:

| | |
|---|---:|
| 1904 ............................................... | $536,905 86 |
| 1905 ............................................... | 405,751 90 |
| From January 1, 1906, to October 3, 1906.............. | 647,920 80 |
| | $1,590,578 56 |

That at all times after January 1, 1904, and prior to October 3, 1906, *Gustave G. Pabst, Frederick Pabst, Jr.,* and Maria Pabst, as trustees under the aforesaid deed of gift, and *Gustave G. Pabst, Frederick Pabst, Jr.,* and Maria

Pabst, as executors of the last will of Frederick Pabst, deceased, and *Gustave G. Pabst, Frederick Pabst, Jr., Maria Goodrich,* and *Emma Soehnlein,* individually, together held more than a majority of the stock of the Pabst Brewing Company, and that at all times after October 3, 1906, said persons, with the exception of Maria Pabst as trustee and Maria Pabst as executor, held together more than a majority of the stock of said company, and that after January 1, 1904, the directors of said company were *Gustave Pabst,* president; *Frederick Pabst, Jr.,* W. O. Goodrich, husband of *Maria Goodrich,* C. W. Henning, vice-president, and H. J. Stark, secretary. That it was the intent of the testator, as manifested by the will, that his granddaughter, *Emma Maria Pabst,* commonly called *Elsbeth Pabst,* should take and have upon the death of her grandmother, Maria Pabst, stock of said corporation of the book value of $1,000,000, and this amount should neither be increased nor diminished by any redistribution of the stock. That it was the intent of the testator that during the lifetime of his widow, Maria Pabst, *Elsbeth* should receive only suitable support and education, and that after the arrival of *Elsbeth* at the age of twenty-one years she should thereafter share equally in the income of said estate with *Gustave G. Pabst, Maria Goodrich, Frederick Pabst, Jr.,* and *Emma Soehnlein;* but upon the death of Maria Pabst, either before or after the attainment of her majority by said *Elsbeth,* the annual income upon the portion left by said will to or for the benefit of her should be paid during her life, subject to the other provisions for the contingencies contained in the will. That the allegations of the complaint as to request of *Emma Soehnlein* for the loan to her and investment for her benefit of a portion of the trust estate held under the will in trust for the benefit of her and her children, and the security proposed to be given for such loan, are true.

The court concluded as follows: That the annual income

of the portion of the estate bequeathed for the benefit of *Emma Maria Pabst* should be from the 3d day of October, 1906, the date of the death of Maria Pabst, set apart and paid to said *Emma Maria Pabst* during her life, as provided in article 6 of said will. That the number of shares of the stock of the Pabst Brewing Company to which the said *Emma Maria Pabst* is entitled to make the amount of $1,000,000 book value of said stock is 614.5502 shares. That the stock dividend declared by the Pabst Brewing Company December 11, 1906, must be taken as principal of the several trust estates created by said will, and must be issued to the trustees representing the trust estates as part of the principal of said trusts. That in the judgment of the court the plaintiffs, as trustees of *Emma Soehnlein* and her children, ought not to make the loan or investment described in the fourth paragraph of the complaint, but that the court does not declare as matter of law that said trustees have not the power to make such investment or loan, that question being expressly left undecided.

Judgment construing the will was entered in accordance with the findings. Due exceptions were filed, the case brought here by appeal, and the following errors assigned: (1) The court erred in directing that the income from the share given to the trustees for the benefit of *Elsbeth Pabst* accruing after October 3, 1906, should be paid to *Elsbeth*, and in refusing to find that such income should be distributed among the appellants during the minority of said *Elsbeth*. (2) The court erred in determining that there would be required 614.5502 shares of the Pabst Brewing Company stock to make $1,000,000 of book value, the correct number being 567.0689 shares. (3) The court erred in determining that the stock dividend was to be taken as principal of the trust estate created for the benefit of *Elsbeth Pabst*, at least in so far as this dividend upon the excess over the shares necessary to make $1,000,000 was concerned. (4) The court

erred in adjudging that the stock dividend should be taken as part of the principal of the trust estate left for the benefit of the appellant *Emma Soehnlein* and her children.   (5) The court erred in finding that the trustees of *Emma Soehnlein* and her children ought not to make the loan or investment described in the complaint.

For the appellants *Goodrich, Soehnlein, Gustave G. Pabst,* and *Frederick Pabst, Jr.,* as individuals, there was a brief by *Quarles, Spence & Quarles,* attorneys, and *Charles Quarles,* of counsel, and oral argument by *Charles Quarles.* They contended, *inter alia,* that the question whether a stock dividend is to be considered as profit and go to the life tenant or as capital and go to the remainderman is a question as yet undecided in this state.   The decisions of other states and of England lay down substantially four different rules, which are called from their place of origin, respectively, the Massachusetts rule, the Maine rule, the English rule, and the Pennsylvania rule.   The Massachusetts rule holds that money dividends are income and go to the life tenant, but that stock dividends are capital and go to the remainderman.   This rule is followed by the courts of Massachusetts, Rhode Island, Illinois, Connecticut, and the United States.   *Minot v. Paine,* 99 Mass. 101; *Daland v. Williams,* 101 Mass. 571; *Leland v. Hayden,* 102 Mass. 542; *Heard v. Eldredge,* 109 Mass. 258; *Rand v. Hubbell,* 115 Mass. 461, 474; *Adams v. Adams,* 139 Mass. 449; *Davis v. Jackson,* 152 Mass. 58; *Gibbons v. Mahon,* 136 U. S. 549; *In re Brown,* 14 R. I. 371, 51 Am. Rep. 397; *Greene v. Smith,* 17 R. I. 28; *DeKoven v. Alsop,* 205 Ill. 309, 63 L. R. A. 587–590; *Terry v. Eagle L. Co.* 47 Conn. 141; *Brinley v. Grou,* 50 Conn. 66, 47 Am. Rep. 618; *Spooner v. Phillips,* 62 Conn. 62, 24 Atl. 524, 16 L. R. A. 461; *Mills v. Britton,* 64 Conn. 4, 29 Atl. 231, 24 L. R. A. 536; *Hotchkiss v. Brainerd Q. Co.* 58 Conn. 120, 29 Atl. 521.   The Maine rule is that stock dividends, like money dividends, are

income, and must go to the life tenant. That is, that a dividend is a dividend whether in stock or in money. This rule obtains in Maine, New York, and Maryland. *Gilkey v. Paine,* 80 Me. 319, 323; *Richardson v. Richardson,* 75 Me. 570, 46 Am. Rep. 428; *Thomas v. Gregg,* 78 Md. 545; *Quinn v. Safe D. & T. Co.* 93 Md. 285, 53 L. R. A. 169; *McLouth v. Hunt,* 154 N. Y. 179; *Lowry v. Farmers' L. & T. Co.* 172 N. Y. 137, 64 N. E. 796; *In re Warren's Estate,* 11 N. Y. Supp. 787; *Williams v. W. U. Tel. Co.* 93 N. Y. 162. The English rule makes the question depend entirely upon the intention of the corporation as manifested by the action of its board of directors. *Bouch v. Sproule,* L. R. 12 App. Cas. 385. Under the Pennsylvania rule the criterion is the origin of the property out of which the dividend is declared. If this was earned before the creation of the trust, the stock dividend is to be taken as capital; if it was earned after the creation of the trust, it is to be taken as income; and if it was made up of earnings earned partly before and partly after the creation of the trust, the dividend is to be apportioned between the life tenant and the remainderman. This rule obtains in Pennsylvania, New Jersey, South Carolina, Kentucky, Tennessee, and New Hampshire. *Earp's Appeal,* 28 Pa. St. 368, 373, 374; *Wiltbank's Appeal,* 64 Pa. St. 256, 260, 3 Am. Rep. 587; *Biddle's Appeal,* 99 Pa. St. 278, 282; *Vinton's Appeal,* 99 Pa. St. 434, 440, 44 Am. Rep. 116; *Oliver's Estate,* 136 Pa. St. 43; *Smith's Estate,* 140 Pa. St. 344, 352; *Van Doren v. Olden,* 19 N. J. Eq. 176; *Cobb v. Fant,* 36 S. C. 1; *Hite v. Hite,* 93 Ky. 357, 19 L. R. A. 173; *Pritchitt v. Nashville T. Co.* 96 Tenn. 472, 486, 36 S. W. 1064, 33 L. R. A. 856.

*Willet M. Spooner,* guardian *ad litem,* for the appellants and respondents *Edith Soehnlein* and *Beatrice Soehnlein.*

For the executors, as respondents, there was a brief by *Van Dyke & Van Dyke,* and oral argument by *G. D. Van Dyke.*

*Nathan Glicksman,* guardian *ad litem,* for *Elsbeth Pabst.*
He contended, *inter alia,* that the Pabst Brewing Company
having purchased its own stock, whether or not the stock so
purchased was thereby extinguished and canceled so as to
diminish the number of outstanding shares, or is held as an
asset of the corporation subject to future sale, depends upon
the intent on the part of the corporation as shown by its con-
duct.   *Porter v. Plymouth G. M. Co.* 29 Mont. 347, 74 Pac.
938; *Western Imp. Co. v. Des Moines Nat. Bank,* 103 Iowa,
455, 72 N. W. 657; *Ex parte Holmes,* 5 Cowen, 426 (see
p. 435); *Dacovich v. Canizas* (Ala.) 44 South. 473; *Knick-
erbocker Imp. Co. v. State Board* (N. J. Eq.) 65 Atl. 913;
*Comm. v. B. & A. R. Co.* 142 Mass. 146 (see p. 155); *Ral-
ston v. Bank of California,* 112 Cal. 208; *State Bank v. Fox,*
3 Blatch. 431.   The question whether a stock dividend
should be assigned to principal, to income, or apportioned be-
tween them may be classified under two general lines of
authorities: (1) those holding that dividends, whether of
stock or cash, are capable of apportionment; and (2) those
holding that there can be no apportionment of the dividend
and it must go wholly either to principal or income.   The
doctrine under the first head is commonly called the Penn-
sylvania rule.   *Earp's Appeal,* 28 Pa. St. 368; *Vinton's
Appeal,* 99 Pa. St. 434; *Appeal of Phila. T., S. D. & Ins.
Co.* (Pa. St.) 16 Atl. 734; *Appeal of Smith,* 140 Pa. St.
344, 21 Atl. 438; *Van Doren v. Olden,* 19 N. J. Eq. 176;
*Lang's Ex'r v. Lang,* 56 N. J. Eq. 603, 40 Atl. 278; *Brown
v. Brown* (N. J. Eq.) 65 Atl. 739; *Lister v. Weeks,* 61 N. J.
Eq. 215, 46 Atl. 558.   However, under this rule a profit
made by the trustee by selling the right to subscribe to an
increased issue of stock ordered by the corporation after the
creation of the trust is held to go to capital and not to income.
*Moss's Appeal,* 83 Pa. St. 264; *Biddle's Appeal,* 99 Pa. St.
278; *In re Thomson's Estate,* 153 Pa. St. 332, 26 Atl. 652;
*In re Eisner's Estate,* 175 Pa. St. 143, 34 Atl. 577; *Brown*

*v. Brown* (N. J. Eq.) 65 Atl. 739; *Peirce v. Burroughs,* 58
N. H. 302; *Law v. Alley,* 67 N. H. 93, 29 Atl. 636; *Walker
v. Walker,* 68 N. H. 407, 39 Atl. 432.   So zealous are the
courts adopting the Pennsylvania rule to preserve the capital
fund as it existed at the time of the creation of the trust
that they hold that a profit arising from appreciation in the
value of the assets in the hands of the trustee will go to capi-
tal and not to income.   *In re Boyer's Estate,* 174 Pa. St.
16, 34 Atl. 239; *In re Graham's Estate,* 198 Pa. St. 216,
47 Atl. 1108; *In re Park's Estate,* 173 Pa. St. 190, 33 Atl.
884; *Van Blarcom v. Dager,* 31 N. J. Eq. 783; *In re Con-
nolly's Estate,* 198 Pa. St. 137, 47 Atl. 1125; *Quinn v. Mad-
igan,* 65 N. H. 8, 17 Atl. 976.   All authorities with the ex-
ception of those in Pennsylvania, New Jersey, and New
Hampshire agree that corporate dividends, whether of stock
or cash, are nonapportionable.   The conflict arises upon the
question as to when dividends should be assigned to the prin-
cipal and when to income.   It was held in Massachusetts at
an early date that when a corporation accumulates surplus
estate over and above its capitalization and devotes such sur-
plus assets to the uses of its business as working capital,
and as against such accumulated surplus declares a stock div-
idend, such stock dividend should be held to be principal and
not income.   *Minot v. Paine,* 99 Mass. 101; *Daland v. Wil-
liams,* 101 Mass. 571; *Rand v. Hubbell,* 115 Mass. 461;
*D'Ooge v. Leeds,* 176 Mass. 558, 57 N. E. 1025.   The Massa-
chusetts rule has been adopted in Connecticut, the United
States, Georgia, and Maine.   *Spooner v. Phillips,* 62 Conn.
62, 24 Atl. 524; *Mills v. Britton,* 64 Conn. 4, 29 Atl. 231;
*Atkin v. Albree,* 12 Allen, 359; *Brinley v. Grou,* 50 Conn.
66; *Gibbons v. Mahon,* 136 U. S. 549, 10 Sup. Ct. 1057; *In
re Brown,* 14 R. I. 371; *Greene v. Smith,* 17 R. I. 28, 19 Atl.
1081; *DeKoven v. Alsop,* 205 Ill. 309, 68 N. E. 930; *Bil-
lings v. Warren,* 216 Ill. 281, 74 N. E. 1050; *Blinn v. Gil-
lett,* 208 Ill. 473, 70 N. E. 704; *Millen v. Guerrard,* 67 Ga.

284; *Mann v. Anderson,* 106 Ga. 818, 32 S. E. 870.   The New York rule, settled by the later cases, is that money realized from the sale of corporate stock belonging to a trust estate is all capital, though there is received from the stock sold what represents, in part, the interest of the stock in the accumulated earnings of the corporation; and that a cash dividend declared after the creation of a trust out of surplus earnings is nonapportionable and goes to the life tenant, even though the greater part of the earnings upon which the dividend is based were accumulated before the creation of the trust.   *In re Kernochan,* 104 N. Y. 618, 11 N. E. 149; *McLouth v. Hunt,* 154 N. Y. 179, 48 N. E. 548; *Lowry v. Farmers' L. & T. Co.* 172 N. Y. 137, 64 N. E. 796; *Robertson v. De Brulatour* (N. Y.) 80 N. E. 938; *Chester v. Buffalo Car Mfg. Co.* 70 App. Div. 443, 75 N. Y. Supp. 428. The rule adopted in Maryland is substantially like that in New York, except that even greater weight is given to the expression of corporate intent in the resolution declaring the dividend.   *Quinn v. Safe D. & T. Co.* 93 Md. 285, 48 Atl. 835, 53 L. R. A. 169; *Safe D. & T. Co. v. White,* 102 Md. 73, 61 Atl. 295; *Thomas v. Gregg,* 78 Md. 545, 28 Atl. 565.   In Kentucky it is held that stock dividends are nonapportionable and that a stock dividend based on earnings and declared during the life tenancy goes in its entirety to the life tenant.   *Hite's Devisees v. Hite's Ex'r,* 93 Ky. 257, 20 S. W. 778, 19 L. R. A. 173.   The Tennessee court adopts the reasoning of the later New York cases.   *Pritchitt v. Nashville T. Co.* 96 Tenn. 472, 36 S. W. 1064.   The early English decisions give no assistance.   Those decisions will be found reviewed in the opinion in *Van Doren v. Olden,* 19 N. J. Eq. 176; later cases in the opinion in *Pritchitt v. Nashville T. Co.* 96 Tenn. 472, 36 S. W. 1064.

KERWIN, J.   A preliminary question is presented aside from those raised by the assignment of error respecting the

jurisdiction of the court. It is urged that the decision of the second question propounded by the complaint involves a question of distribution only, and not one of construction, and should properly be left to the county court; hence the jurisdiction of the circuit court, and consequently this court on appeal, is questioned. The number of shares of the stock of the Pabst Brewing Company necessary to make $1,000,000 of book value is a question, in view of the peculiar facts in the case, upon which the executors are entitled to the aid of the court. The circuit court has plenary jurisdiction of actions to construe wills and aid executors in the execution of the trust, and the question presented is an important one to be determined in advance of distribution. The trustees are entitled to the protection of the court, and the fact that the question may arise in the county court on distribution is no objection to the determination of the question when presented in the circuit court in an action for construction. *Miller v. Drane,* 100 Wis. 1, 75 N. W. 413; *Burnham v. Norton,* 100 Wis. 8, 75 N. W. 304; *Stephenson v. Norris,* 128 Wis. 242, 107 N. W. 343. We find no difficulty, therefore, in holding that the court below had jurisdiction to pass upon all the points involved in the action, and hence the questions are here on appeal.

1. It is urged by appellant that it was the intention of the testator that *Elsbeth,* during her minority, should receive only her maintenance and education. This contention involves the construction which should be placed upon certain articles of the will. It is insisted that but one trust was created which took effect at the death of the testator, and that the duration of this trust was not limited to the lifetime of Mrs. Pabst. By the third article of the will the testator in plain and unequivocal terms bequeaths to his executors the substance of his property in trust during the life of his wife, among other things, to pay "all proper expenses for the suitable support and education of my granddaughter and

adopted daughter, *Emma Maria Pabst,* commonly called *Elsbeth Pabst,* until she shall arrive at the age of twenty-one years, and to divide the net income of said property after said payments, annually or at such times as may be convenient, in equal shares, among my children," in manner provided,. and further provides that on the arrival of *Elsbeth* at the age of twenty-one years she "shall take an equal share with the other of said children in said distribution of income, subject to the same conditions above provided." The. fourth article provides for the division of the estate upon the death of testator's wife into as many parts as there are children, and that said parts shall be equal, except that there shall be transferred to the part designated for *Elsbeth,*. as provided in the sixth paragraph of the will, such number of shares of the capital stock of the Pabst Brewing Company as shall represent a book value of $1,000,000, so that said part shall exceed each of the other parts by the amount of said shares of stock.    The sixth article expressly provides. that upon the death of the testator's wife the shares intended for *Elsbeth* shall continue to be held in trust by the executors,. provided *Elsbeth* be living at that time, and the annual income paid to her during her life.    The testator's widow, Maria Pabst, died October 3, 1906, leaving *Elsbeth* living and of the age of sixteen years.    The court below found that *Elsbeth* was entitled to the income upon the portion bequeathed to her from the date of the death of the testator's. widow.

Whether the will be regarded as creating two trusts or one,. it is, we think, apparent that the testator had in mind a scheme of distribution covering two distinct terms: one during the life of his wife and the other afterwards.    The bequest was in trust for the life of the testator's wife, and upon her death, by the terms of the will, was to be divided into five parts, three of which dropped out of the trust and the other two continued.    The express terms in the third article of the

will respecting *Elsbeth* have reference to the period of time during the life of Mrs. Pabst, while those in the fourth and sixth articles refer to the rights which vested in *Elsbeth* under the will upon the decease of Mrs. Pabst. The provision in the third article for the support and education of *Elsbeth* until she became of age and for the taking of her portion of the income at her arrival at majority, followed by the provision in the fourth article that she take her share on the death of Mrs. Pabst, and the sixth article to the effect that the "remaining part of my estate"—that is, *Elsbeth's* part—shall continue to be held in trust if she be then living, and the income paid to her, seems to disclose the intention of the testator that *Elsbeth,* until she arrived at majority, should receive the provision made for her in the third article, provided Mrs. Pabst should live until that time; but if Mrs. Pabst died before *Elsbeth* attained majority, in such event *Elsbeth* was to immediately come into possession of her income. This construction of the will would give force and effect to all its parts and entitle *Elsbeth,* upon the death of Mrs. Pabst, to receive the income on her portion, whether she be then twenty-one years of age or not; the provision in the third article that she come into possession of the income when she arrived at the age of twenty-one having reference to the event of her arrival at majority before the death of Mrs. Pabst. In this way the words in each paragraph of the will may be given such force and effect as to harmonize the whole instrument and permit all parts to stand together, and we think, under the authorities, it should be given such construction. *Dew v. Kuehn,* 64 Wis. 293, 25 N. W. 212; *Lovass v. Olson,* 92 Wis. 616, 67 N. W. 605; *Davies v. Davies,* 109 Wis. 129, 85 N. W. 201; *In re Donges's Estate,* 103 Wis. 497, 79 N. W. 786; *In re Will of Kopmeier,* 113 Wis. 233, 89 N. W. 134; *Becker v. Chester,* 115 Wis. 90, 120, 91 N. W. 87, 650. Giving the will this construction harmonizes the different provisions and appears to carry out

the intention of the testator. It is the duty of the court in constructing wills to ascertain the intention of the testator, if that can be determined from the instrument itself, and in seeking out the intention words are to be given their plain and ordinary meaning. *Sherwood v. Sherwood,* 45 Wis. 357; *In re Donges's Estate, supra; Davies v. Davies, supra; In re Moran's Will,* 118 Wis. 177, 96 N. W. 367; *In re Bouck's Will, post,* p. 161, 111 N. W. 573. In harmony with these well-established principles respecting the construction of wills, we think that the testator intended *Elsbeth* should receive her support and education during the life of Mrs. Pabst and come into possession of her income on attaining majority, provided Mrs. Pabst should live until that time; but, in case of her death before *Elsbeth* attained majority, in such event *Elsbeth* should receive the annual income on her portion from the time of Mrs. Pabst's death. This construction harmonizing the different articles of the will makes it unnecessary to consider other questions of construction respecting the rules of law that where two provisions are in conflict the latter prevails, and the rule that the law prefers a construction in favor of the early vesting of estates, and a vested rather than a contingent estate. We do not think a resort to these rules of construction necessary, because upon its face the will discloses the intention of the testator that *Elsbeth* should receive the income on her portion of the estate immediately upon the death of Mrs. Pabst, and that the court below was right in giving it that construction.

2. The court below found that the number of shares of the Pabst Brewing Company's stock at book value necessary to make $1,000,000, to which *Elsbeth* was entitled, is 614.5502. The fourth article of the will provides that upon the decease of the testator's widow "the entire estate shall be divided." On October 3, 1906, the date of Mrs. Pabst's death, the Pabst Brewing Company owned 3,322 shares of its stock, and the question arises under this head whether the

stock so owned by the company should be regarded as retired and canceled, or whether it should be treated as outstanding. If it be regarded as retired, *Elsbeth* would be entitled to 567.0689 shares, and if outstanding she would be entitled to 614.5502 shares. The court below found that she was entitled to the latter number, and found in detail the facts respecting the purchase of stock by the company and its manner of dealing with it, and found the stock had not been retired but was outstanding, and the appellants claim this was error. Here, again, we must refer to the rule that the intention of the testator is controlling. The Pabst Brewing Company, at the time of the execution of the will, had an authorized capital stock issued and outstanding of $10,000,000, divided into 10,000 shares of $1,000 each. The manifest purpose of the testator in the distribution of his bounty was to treat *Elsbeth,* his granddaughter and adopted daughter, the same as his other children. So he divided his estate into equal parts, and added to *Elsbeth's* portion shares of the capital stock of the Pabst Brewing Company sufficient to make $1,000,000 book value, and stated in his will as a reason for this that he had transferred by way of gift a like amount in book value of the stock for the benefit of each of his children, *Gustave G. Pabst, Maria Goodrich, Frederick Pabst, Jr.,* and *Emma Soehnlein,* contemporaneously with the making of his will. The court below found that "said Pabst Brewing Company at all times, by its method of treatment of such 3,322 shares of purchased stock, regarded and held the same as part of its assets and as an asset on hand, and at all times prior to December 11, 1906, elected to treat the same as in force and in effect and as outstanding." This stock was never canceled, but held and kept alive by the corporation. The corporation, being solvent, had the right to purchase and hold its own stock. *Shoemaker v. Washburn L. Co.* 97 Wis. 585, 73 N. W. 333; *Calteaux v. Mueller,* 102 Wis. 525, 78 N. W. 1082; *Marvin v. Anderson,* 111 Wis. 387, 87

N. W. 226. And such purchase does not amount to a cancellation of the stock purchased. 1 Cook, Corp. (5th ed.) § 313; Taylor, Priv. Corp. (5th ed.) § 135; Elliott, Priv. Corp. (3d ed.) § 193; *Western Imp. Co. v. Des Moines Nat. Bank,* 103 Iowa, 455, 72 N. W. 657; *Porter v. Plymouth G. M. Co.* 29 Mont. 347, 74 Pac. 938. A corporation clearly has the right to purchase its stock, keep it alive, and treat it as assets. It is manifest it did so, as appears from the findings, which are supported by the evidence. Now the testator by his will provided that *Elsbeth* should receive shares of the capital stock, clearly contemplating she should receive shares of the 10,000 shares then outstanding. Some of the 3,322 shares of stock had been purchased and were held by the corporation as assets before the testator had made his will, and he knew the method of doing business and that the stock was considered as assets. *Elsbeth's* stock under the will was to be set apart at the time of Mrs. Pabst's death, October 3, 1906, and at that time, under the findings and the evidence, the stock was outstanding, and, according to the books as they then stood, it required 614.5502 shares to make a book value of $1,000,000. The fact that a dividend was declared afterwards on December 11, 1906, by the corporation does not alter the case. All the stock participated in this dividend as of December 11, 1906, that received by the testator's children when the will was made as well as that set apart for *Elsbeth* October 3, 1906. So we think, as well upon the grounds of the intention of the testator as upon the facts proved and found respecting the corporation's treatment of the stock, it was outstanding October 3, 1906, and not surrendered. The court found it was the intention of the corporation to hold the purchased stock as assets, and whether it did or not is largely a question of intent. *Porter v. Plymouth G. M. Co.* 29 Mont. 347, 74 Pac. 938; *Western Imp. Co. v. Des Moines Nat. Bank,* 103 Iowa, 455, 72 N. W. 657; *Dacovich v. Canizas* (Ala.) 44 South. 473; *Knicker-*

*bocker Imp. Co. v. State Board* (N. J. Law) 65 Atl. 913;
*Comm. v. B. & A. R. Co.* 142 Mass. 146, 155, 7 N. E. 716;
*Ralston v. Bank of California,* 112 Cal. 208, 44 Pac. 476.
So we think upon any theory of the case the shares of stock
purchased by the corporation must be regarded as outstand-
ing and corpus of the estate and not income.

3. Error is assigned because the court below determined
that the stock dividend declared December 11, 1906, was
to be taken as principal of the trust estate, at least upon the
portion not necessary to make *Elsbeth's* $1,000,000. As we
have before seen, up to December 11, 1906, the 3,322 shares
of stock bought in by the corporation had been carried upon
its books as outstanding stock and had a potential existence
for the purpose of resale. There is in the briefs of counsel a
lengthy and interesting discussion of the different rules,
known as the Pennsylvania, Massachusetts, and New York
rules, respecting the distribution of dividends as regards the
life tenant and remainderman. But if the stock dividend, or
so-called dividend, declared December 11, 1906, was not in
fact income, but part of the corpus of the estate, we are re-
lieved of any discussion of the vexed question arising under
these several rules respecting the distribution of income be-
tween life tenant and remainderman. As appears from the
findings and the evidence, the 3,322 shares distributed, or at-
tempted to be distributed, by the resolution of December 11,
1906, were not income. They were not purchased with earn-
ings or income of the company. Two hundred eighty of these
shares were held and owned by the company in the testator's
lifetime and the balance were purchased after his death,
twenty-four shares being paid for out of the treasury of the
company, and the remaining 3,018 by transferring to the
seller $600,000 worth of real estate of the Pabst Brewing
Company, and the remainder of the purchase price by the pro-
ceeds of a loan made upon bonds issued by the Pabst Brewing
Company secured by a mortgage upon the plant of the com-

pany and fixtures, together with real estate in several states outside of Wisconsin, the bonds being in the aggregate $3,500,000. Therefore it is perfectly clear that all of these 3,322 shares of stock so held by the corporation on the 3d day of October, 1906, were a part of the principal or assets of the Pabst Brewing Company and not income. The detailed findings of the court below respecting the bookkeeping, the cash dividends declared from the time of the execution of the will of the testator up to the time of the death of Mrs. Pabst, October 3, 1906, clearly establish these facts, and it is unnecessary to go into a discussion of them in detail here. Of these 3,322 shares there were in the estate of the testator 1,918 shares, and after deducting the 614.5502 shares going to *Elsbeth* to make her $1,000,000, the balance, under the will, went in equal parts to *Gustave G. Pabst, Frederick Pabst, Jr., Maria Goodrich, Emma Soehnlein,* and *Elsbeth.* This was the condition of the assets of the estate at the time of the death of Mrs. Pabst, and under the terms of the will these assets went to the different legatees named as corpus of the estate and not as income. There was no income included in any of these shares at the time the rights of the legatees attached upon the death of Mrs. Pabst, and it was beyond the power of the corporation to change the character of the stock owned by the testator after his death so as to divert it into channels not contemplated by him. The will provided expressly for a division of the entire estate of the testator at the time of the death of Mrs. Pabst, and these shares of stock then owned by the estate, being principal and not income, necessarily passed as such to the legatees, and could not by any subsequent act of the corporation be diverted from that course so as to defeat the manifest intention of the testator. If the resolution of December 11, 1906, had the effect of converting the purchased stock into income, the result would simply be to allow the corporation to carve out a portion of the assets of the corporation, call it income and de-

clare it such, and thereby defeat the intention of a deceased stockholder as expressed in his will. The question under this assignment of error simply turns on whether or not the outstanding stock, 1,918 shares of which belonged to the testator, was income or principal of his estate, and we think it very clear that it was the latter, and went as such to the different legatees on the death of Mrs. Pabst. A case quite in point is *Gilkey v. Paine,* 80 Me. 319, 14 Atl. 205. The court below found on sufficient evidence that the stock dividend of December 11, 1906, was not a distribution of profits or dividend strictly as between tenant for life and remainderman, but was simply a redistribution of the purchased shares of stock of the corporation as representing permanent capital. The contention of appellants is that the shares distributed by the dividend of December 11, 1906, should go to the adult children as income, or at least so much of the amount represented by this dividend as represented the profits earned by the Pabst Brewing Company after the death of the testator should be so paid. But this contention brings us back primarily to the question of whether this stock dividend was principal or income, and we conclude from the findings and the evidence that it was principal and should be distributed as corpus of the estate.

4. The next question involved is whether the executors, under the authority to invest conferred by the ninth article of the will, have the power to make the investments mentioned in the complaint. The complaint alleges that *Emma Soehnlein* has requested the plaintiffs, as executors, to loan to her a portion of the trust estate by them held in trust for the benefit of herself and children, not to exceed $250,000, upon her personal obligation, secured by stocks and bonds of Soehnlein & Co., a corporation of Germany with a capital stock of 1,500,000 marks, equivalent to $375,000, and engaged in the manufacture of champagne, or to dispose of a portion of the trust fund and invest the proceeds in the stock

of said company; she representing that the corporation has a plant consisting of real estate worth $325,000 and a large amount of other property, and has earned more than ten per cent. for twenty years last past, and that all of the stock of said corporation is owned and held by her husband and the members of his family, that the company has a bond issue of $250,000 secured by a mortgage on its real estate and plant, and its indebtedness, in addition to said bond issue, does not exceed $100,000, and that the plaintiffs, as executors, are ready to make such loan, provided upon investigation they are satisfied with the security and have power under the will to make such loan. The court below found the allegations of the complaint in this respect true, and further found that the trustees ought not to make the loan or investment referred to, but did not expressly determine as matter of law that the trustees had no power to do so.

The executors and trustees under the will are given power and authority to manage and control the property "according to their judgment and discretion, and to sell and dispose of any portions thereof, including any real estate." And the will further provides respecting the power conferred:

"And I give them full authority to invest the trust properties in such manner as they shall deem best, with no responsibility for losses, provided they act honestly and in good faith."

This in terms is a very broad power, but it must have a reasonable, if not a strict, construction, in the light of the well-established law governing the action of trustees charged with such duties. 2 Underhill, Wills, 1146, § 790. The authority given to invest the property in manner "as they shall deem best" must be held to vest in them a reasonable and not an arbitrary discretion, and to imply a duty to execute the trust in accordance with existing laws governing trustees in the execution of their trust. *In re Allis's Estate,* 123 Wis. 223, 101 N. W. 365; *Simmons v. Oliver,* 74 Wis. 633,

43 N. W. 561; *Ackerman v. Emott,* 4 Barb. 626; Hill, Trustees, 368; 1 Perry, Trusts (5th ed.) § 453; 3 Pom. Eq. Jur. (3d ed.) § 1074; *Clark v. Garfield,* 8 Allen, 427; *King v. Talbot,* 40 N. Y. 76, 87; *Tuttle v. Gilmore,* 36 N. J. Eq. 617; *Davis, Appellant,* 183 Mass. 499, 67 N. E. 604; *In re Hart's Estate,* 203 Pa. St. 480, 53 Atl. 364; *Pray's Appeals,* 34 Pa. St. 100; *Mattocks v. Moulton,* 84 Me. 545, 24 Atl. 1004; *Brown v. Brown* (N. J. Ch.) 65 Atl. 739; *Matter of Hall,* 164 N. Y. 196, 58 N. E. 11.

In *Davis, Appellant,* 183 Mass. 499, 67 N. E. 604, the power in terms was broad, giving the trustees power to invest "in such manner as to them shall seem expedient," and it was held that they were not relieved from the obligation to exercise a sound judgment and a reasonable discretion in regard to such investments as they might make under the authority given. In *In re Hart's Estate,* 203 Pa. St. 480, 53 Atl. 364, the power was to invest in such securities "as may in their judgment be best." In speaking of this broad power conferred upon the trustee the court said:

"His obvious duty was to preserve the principal by reasonably safe investments, and to pay such income as was earned from such investments to those entitled thereto. He was not to increase the income by any sort of supposed largely remunerative investments which might endanger the principal. . . . It was not an unlimited authority to invest the money as an ordinarily prudent man would invest his own. . . . He must take such risks only as an ordinarily prudent man would take who is trustee of the money of others."

In *Mattocks v. Moulton,* 84 Me. 545, 24 Atl. 1004, the authority was broad, and no limits put to the discretion of the trustee. The court said (84 Me. 545, 24 Atl. 1006):

"The law does not hold a trustee responsible for errors in judgment when he has been careful to enlighten that judgment; but we think the law does require of a trustee, even under a will like this, more than good faith and honest judgment. We think it must be assumed that the testatrix made

this part of her will with reference to the well-known legal and equitable rules governing trustees, and that she intended the trustee of her appointment to be mindful of them. True, she left the investment of the trust estate to his judgment, but it was to his judgment as trustee enlightened and guided by the approved rules applicable to the investment of trust funds, not to his uninformed, personal judgment, exercised without reference to legal rules and principles. . . . He must always bear in mind that he is dealing with trust funds, which were not given him to be used in developing or furthering business enterprises, but to be guarded carefully and invested cautiously, so that principal, as well as interest, may be forthcoming at the appointed time. While he must be as diligent and painstaking in the management of the trust estate as the average prudent man is in managing his own estate, he may not always place the trust funds where he, or the average prudent man, would place his own funds."

Many other cases might be cited in support of the doctrine above enunciated. There can be no doubt, under a power broad as the one under consideration, that the trustees are bound to act in good faith and exercise a sound judgment and prudent discretion in making an investment. They are bound to look to the interests of the remainderman as well as to those of the life tenant, and place the trust estate in no hazardous position. 17 Am. & Eng. Ency. of Law (2d ed.) 459; *In re Hart's Estate,* 203 Pa. St. 480, 53 Atl. 364. The question arises upon the facts before us whether, in the exercise of a sound judgment, the trustees were authorized to make the proposed investment. It is conceded by counsel for appellants that the general rule is that investments should be made within the court's jurisdiction, but that this rule is subject to exception, and should not be made so rigid as to admit of no possible exception, citing *Ormiston v. Olcott,* 84 N. Y. 339; *Denton v. Sanford,* 103 N. Y. 607, 9 N. E. 490; and *Clark v. Clark,* 23 Misc. 272, 50 N. Y. Supp. 1041. But these cases recognize the general rule to the effect that executors have no power to invest trust funds beyond the ju-

risdiction of the court in the absence of express authority to
do so.   In *Denton v. Sanford, supra,* at page 613 (9 N. E.
492), quoting from *Ormiston v. Olcott,* 84 N. Y. 339, the
court said:

"While, therefore, we are not disposed to say that an in-
vestment by a trustee in another state can never be consist-
ent with the prudence and diligence required of him by the
law, we still feel bound to say that such an investment, which
takes the trust fund beyond our own jurisdiction, subjects
it to other laws, and the risk and inconvenience of distance
and of foreign tribunals, will not be upheld by us as a gen-
eral rule, and never unless in the presence of a clear and
strong necessity, or a very pressing emergency."

And in *Thayer v. Dewey,* 185 Mass. 68, 69 N. E. 1074,
the court, while recognizing that in that state there is no arbi-
trary rule against investment in a foreign state, holds that
there is grave objection to such investment of a trust fund
"where the property is beyond the jurisdiction of our courts,
and is subject to laws different from our own."   We are
also cited by counsel for appellants to *Clark v. Clark,* 23
Misc. 272, 50 N. Y. Supp. 1041; *Clark v. Beers,* 61 Conn.
87, 23 Atl. 717; *Knowlton v. Bradley,* 17 N. H. 458; and
*Citizens' Nat. Bank v. Jefferson,* 88 Ky. 651, 11 S. W. 767.
None of these cases involves the question of a foreign invest-
ment and cannot be said to be out of harmony with the gen-
eral rule respecting the duties of trustees as laid down in the
authorities upon the subject heretofore referred to in this
opinion.   Counsel for appellants also rely upon *In re Allis's
Estate,* 123 Wis. 223, 101 N. W. 365.   It will be seen, how-
ever, that in that case the investment was of the kind con-
templated in the will, and therefore was not restricted to the
conditions and limitations imposed by law for the investment
of trust funds.   The powers given, as this court said, were
of the "broadest kind," and the purpose of the testator, as
manifested in the will, evidently was that such investment
in question be made.

The English rule is that a trustee can only protect himself against risk by investing the trust fund in real estate and government securities, or in a fund approved by the court. *Ackerman v. Emott,* 4 Barb. 626; 1 Perry, Trusts (5th ed.) § 453; *Clark v. Garfield,* 8 Allen, 427. This court has followed the English rule. *Simmons v. Oliver,* 74 Wis. 633, 43 N. W. 561; *In re Allis's Estate,* 123 Wis. 223, 101 N. W. 365. Legislation in this state has to some extent modified the English rule. Ch. 317, Laws of 1903; *In re Allis's Estate,* 123 Wis. 223, 101 N. W. 365. When we look to the language of the will and the circumstances surrounding it, we discover nothing from which we can find an intention on the part of the testator that such an investment as proposed should be made. As we have seen, the general rule is against the right of the trustee to make foreign investments under power to invest quite similar to the power in the will under consideration. It is manifest that, if the proposed investment be made, the property will pass beyond the jurisdiction of the court and in a measure beyond the control of the trustees. We cannot think that the testator intended to confer such power. As said by the court in *Matter of Hall,* 164 N. Y. 196, 58 N. E. 11:

"The trusts of this will are to provide the testator's children with incomes during their lives, and on their deaths the principal is to go to their issue. The very object of the creation of the trust was, therefore, the security of the principal; otherwise the testator might better have given the property outright to his children, who were the primary objects of his bounty."

We believe, in the light of the authorities, that the testator must have intended by the language used that the executors in exercising their judgment should exercise it as trustees bound to secure a safe, and not a hazardous, investment and within the jurisdiction of our courts and not in a foreign land. The court below was of the opinion that the investment

should not be made, and, while it did not pass directly upon the question of power to make it, it is quite obvious that it was of the opinion that the trustees had no power to make the proposed investment, and we are of the same opinion, and so hold. It follows from what has been said that the judgment of the court below must be affirmed.

*By the Court.*—The judgment of the court below is affirmed. Each party is entitled to the taxable costs in this court, to be paid out of the estate.

TIMLIN, J., took no part.