GILCHRIST and others, Executors, Appellants, vs. HIGHFIELD and others, Respondents.

*October 7—October 26, 1909.*

*Corporations: Purchase of own capital stock.*

A corporation has power to purchase shares of its own capital stock when such purchase is made with no illegitimate or fraudulent purpose and no rights of creditors suffer thereby. TIMLIN, J., dissents.

APPEAL from a judgment of the circuit court for Douglas county: A. J. VINJE, Circuit Judge. *Affirmed.*

This action was brought by plaintiffs, as executors of Ella J. Potter, a stockholder in the Webster Manufacturing Company, to declare invalid a purchase of 364 shares of its stock by the corporation and the payment therefor of $25,480 of corporate money, and to compel the three directors voting for such purchase, namely, *Highfield, Gard,* and *Alvord,* to refund to the company such sum so paid. Webster Manufacturing Company was organized for the general purpose of manufacturing chairs. It had $225,000 of nominal stock divided into 2,250 shares, all of which, except 119 shares, were outstanding. *Highfield* and Brigham, in equal partnership, owned 1,126 shares. For several years they had been the two active managing officers for the company, *Highfield* as business manager and Brigham as superintendent of manufacture. Their personal relations had become strained so that they could not work harmoniously together, and Brigham had insisted that one or the other must get out, and either his stock must be bought so that he could retire from the company, or *Highfield* must sell out and withdraw. In pursuance of this view he gave an option to sell his 564 shares of stock at $70 per share to *Highfield* or the corporation in July, 1907. The last previous financial statement of January 1, 1907, showed assets of the company $214,519 in

excess of all liabilities and of the capital stock at par and absence of any debts except current payroll. *Highfield* availed himself of the option to buy 200 shares, which, it appears, was up to the extent of his financial ability. A directors' meeting was then held, at which the three defendant directors and Brigham voted that the corporation purchase the remaining 364 shares upon the option, and accordingly that stock was assigned to the corporation, the certificates canceled and new certificates issued, and the purchase price paid to Brigham, who is not made a party to this action. At the next ensuing stockholders' meeting the act of the directors in making such purchase was fully ratified, such ratification, however, requiring the support of *Highfield's* votes to supply the majority. The court held that the purchase of the stock was in accordance with good business judgment in the interest of the corporation and for no ulterior or improper purpose, and rendered judgment dismissing the action, from which plaintiffs appeal.

For the appellants there was a brief by *Luse, Powell & Luse,* attorneys, and *H. R. Spencer,* of counsel, and oral argument by *L. K. Luse.*

For the respondents the cause was submitted on the brief of *H. V. Gard.*

DODGE, J. The purchase of the 364 shares of stock by the corporation from Brigham is claimed to be wholly void upon the ground asserted that a corporation has no power to buy its own capital stock. This contention seems to need little discussion. While the English authorities are to that effect, and while similar holdings have been made in some of the states, the great weight of authority is in favor of such power, when exercised with no illegitimate or fraudulent purpose and when no rights of creditors suffer thereby. In the face of this conflict of decision this court long ago, upon support from the supreme court of the United States, adopted the

view that, generally speaking, corporations have such power, and has persisted therein so long that we have no doubt property rights of great magnitude have grown up in reliance thereon. *Shoemaker v. Washburn L. Co.* 97 Wis. 585, 73 N. W. 333; *Calteaux v. Mueller,* 102 Wis. 525, 78 N. W. 1082; *Marvin v. Anderson,* 111 Wis. 387, 87 N. W. 226; *Pabst v. Goodrich,* 133 Wis. 43, 113 N. W. 398; *Atlanta & W. B. & C. Asso. v. Smith,* 141 Wis. 377, 123 N. W. 106. The law in this state must be considered so settled.

Another contention is that, conceding such power in the corporation, the defendants, acting on the board of directors and also voting their stock in ratification of the directors' act, were actuated by a purpose to deprive the plaintiffs of their just rights in the corporation, especially by reducing the amount of the voting stock so that defendants would hold a majority thereof—a purpose which was condemned in *Luther v. C. J. Luther Co.* 118 Wis. 112, 94 N. W. 69. But the trial court has found against the existence of any such motive, or any ulterior or illegitimate intent or purpose other than the promotion of the best interests of the corporation according to the honest judgment of the defendants. This finding, we think, is fully supported by a preponderance of the evidence and must preclude any interference by a court with acts in pursuance of the business policy adopted in good faith by the holders of a majority of the capital stock. *Theis v. Durr,* 125 Wis. 651, 659, 104 N. W. 985; *Figge v. Bergenthal,* 130 Wis. 594, 616, 109 N. W. 581, 110 N. W. 798; *Gamble v. Queens Co. W. Co.* 123 N. Y. 91, 99, 25 N. E. 201.

*By the Court.*—Judgment affirmed.

TIMLIN, J. (*dissenting*). I have no doubt that under some exceptional circumstances, as where the transaction does not affect the creditors injuriously and all the shareholders consent, or where a purchase is necessary to realize

upon a prior existing demand of the corporation which might otherwise be lost, and such like cases, a court will not disturb the act of a corporation in buying in shares of its own stock when such act is not expressly forbidden by statute.    There is in all such cases a corporate interest subserved by so doing, outside of the mere advantage of the act of purchase.    The acquiescence of the other shareholders, or the fact that they sustained no pecuniary loss thereby, suffices to close the doors of a court of equity against them, and the attack is usually, if not always, made in equity.    But it is quite another question whether the office-holding majority can use the corporate funds or credit for this purpose against the protest of the minority shareholders and so preserve the control of the corporate offices by the former and deprive the minority of dividends by thus disposing of the surplus properly applicable to the payment of dividends, or by thus creating corporate debts which must be met before dividends are paid. I cannot bring myself to believe that the decision of this case by the majority of the court is either correct in principle, supported by precedents in this state, or conforming to statutes of this state or to wise policy.    It has been said by those competent that in no other civilized country have the rights of minority shareholders so little consideration as here, and it would not, I think, be extravagant to say that the belief prevails here that the shareholders in a stock corporation are not sufficiently protected by the courts against the manipulations and frauds of the majority shareholders or of the directors and officers, who often regard themselves as the mere tools of the majority which placed and holds them in office.    I wish to enter a protest against the decision by the majority as fostering just such evils and injustice.

The relevant facts are: The Webster Manufacturing Company is a stock corporation organized and existing under the laws of Wisconsin for the purpose of carrying on the business of manufacturing.    There was nothing in its articles of

organization authorizing it to buy its own shares. Its author-
ized capital stock was 2,250 shares of the par value of $100
each, and its issued and outstanding capital stock held by
shareholders at the time of the option agreement hereinafter
mentioned was 2,130.9 shares.   *A. W. Highfield* and *C. F.*
Brigham, as copartners, owned 1,126 of said shares since
February, 1904.   *Highfield* owned fifty-two shares individu-
ally and Brigham one share, and they of course controlled the
corporation, and during this time *Highfield* was president.
and Brigham secretary, and both directors.   On January 1,
1907, as shown by the books of the corporation, the liabilities,
outside of capital stock liability, amounted to only $3,866.49,
and the assets, after deducting a capital stock liability of
$225,000, showed a surplus of $214,519.65.   This left the
book value of each share outstanding at $204.40 plus.   The
minority shareholders had been for some time dissatisfied
with the conduct of the business of the corporation, particu-
larly with reference to paying dividends—only two dividends
having been declared in ten years prior to July, 1907, one of
five per centum and another of six per centum.   The remain-
ing 951.9 shares outstanding were held, 500 shares by the
plaintiffs as executors, 137 shares by other persons who were
directors, and about 314 shares by ordinary unofficial share-
holders.   June 10, 1907, Brigham executed to *Highfield* and
the corporation an option by the terms of which either
*Highfield* or the corporation might buy his 564 shares within
thirty days at $70 per share.   Within the thirty days thereby
fixed *Highfield* accepted the option as to 200 of the 564
shares, and the board of directors, for the corporation, ac-
cepted it as to 364 shares.   Evidence to show that *Highfield*
borrowed the money from the corporation to buy this 200
shares was offered and rejected.   *Highfield* paid for and re-
ceived the 200 shares, and the corporation paid out $25,480
for and received the 364 shares.   The plaintiffs had no notice
of this purchase until some time in October, 1907, and they

objected to it. At the ensuing annual shareholders' meeting in January, 1908, a motion was made to ratify the action of the directors in purchasing these 364 shares of stock for the corporation, and *Highfield* voted 815½ shares in favor of such ratification, *Gard,* one of the directors making the purchase, voted fifty-two shares in the same way, and forty other shares were voted, making 907½ shares for ratification; and 605½ shares, including the plaintiffs', voted against such ratification.

The circuit court found that $70 per share, the price paid for the Brigham shares, was fair and reasonable, and that differences existed between *Highfield* and Brigham which threatened to injure the business of the company and it did not seem practicable for both to remain in the corporation; that the directors believed that an attempt was being made by a competing manufacturer to get control of the corporation by purchase of the Brigham stock and the stock of plaintiffs, and that this would be detrimental to the interest of the latter corporation, and in the purchase of the Brigham stock for the corporation the directors acted in good faith and believed they were acting for the best interests of the corporation. There is an apparent inconsistency between the thirteenth finding, to the effect that the corporation had at the time of the purchase of the Brigham stock a net surplus of assets over and above liabilities, including liability to capital stock, amounting to $214,500, and the sixteenth finding, to the effect that the price of $70 per share paid by the corporation for the Brigham stock was fair and reasonable. If the fair and reasonable value of the shares was $70 each, then there was at the same valuation no surplus and insufficient assets to balance capital stock. This would indicate that the assets were overvalued on the books of the corporation, or that in the one case the cash market value was considered, which was much less than the value of unconverted assets.

When a corporation possessing property consisting of land,

merchandise, raw material, bills and accounts receivable, and cash, buys in its own shares for cash against the protest of the minority shareholders, it thereby not only decreases its assets applicable to the payment of dividends, but also, against the will of the dissenting stockholders, decreases the corporate assets and increases the fractional interest of such shareholder in the residue of the assets. This is so whether the shares purchased in by the corporation be canceled and retired or whether they be held by the corporation as outstanding, as a little reflection will show. In such case the corporation in effect says to the dissenting shareholder: "You shall no longer have your former fractional interest in real estate, material, merchandise, bills and accounts receivable, and cash; but you shall from henceforth have a larger fractional interest in a reduced total of less desirable property." Every one knows that this is not an equivalent in value of his former holdings. A portion of cash capital is essential to the enjoyment and realization of the full value of the other property. The remaining property is not available for the payment of dividends, but must be converted into cash for that purpose. On the other hand, if the corporation has no cash or no sufficient cash with which to buy the offered shares and is obliged to incur a corporate debt in order to make the purchase, the value of the shares of the objecting shareholder is still further impaired and his chance of obtaining dividends still more remote, because it will then require payment of the debt thus incurred as well as conversion of the property into money before he can expect a dividend.

Men invest their money in corporate enterprises for the principal and lawful purpose of receiving dividends thereon. The primary object in the organization and operation of a stock corporation is to pay dividends. Any act which prevents or postpones this corporate function is necessarily a wrong and injustice to the minority shareholder. The purchase by a corporation of its own stock not only changes the

fractional interest of the dissenting shareholder against his will, but it changes the character of his property in which he has an interest, deprives him of the chance of dividends, increases against his will his proportionate liability to clerks and servants and laborers under sec. 1769, Stats. (1898), and also is effectual in silencing and eliminating a shareholder (the seller to the corporation) who might vote with the dissenting shareholders at the next corporate election and against the office-holding majority. Aside from any question of good faith or bad faith, it ought to require a pretty clear statutory authority to justify such jockeying with the rights of others.

Other objections are found to the exercise of such a power. 3 Thomp. Comm. on Corp. § 3701. Here that author says, speaking of the liability of a shareholder holding shares as trustee:

"If the vicious doctrine prevails in the particular forum that a corporation can be the general owner of its own shares, just as a man can be the owner of his own promissory note, and if the corporation sees fit to own, so to speak, its own shares, by having them vested in a trustee for its own use, then it is difficult to say how such a court would answer this question, because a court that can fall into the aberration of holding that a man can be the owner of his own debt can fall into any other species of judicial aberration."

Let us see what the statutes are.

"The property of any corporation organized under any special or general law shall be used only for the purposes prescribed by such law or by its articles of organization in pursuance thereof." Sec. 1767, Stats. (1898).

That is, not purposes prescribed by law, but prescribed by the law (statute) under which the corporation is organized. These purposes are enumerated in sec. 1748 and sec. 1771, Stats. (1898), and buying its own shares is not one of them either expressly or by implication. Other statutes *in pari materia* recognize this. For example: A special authorization

to buy in its own stock was thought necessary in case of cer-
tain specified corporations. Sec. 1784. Corporations like
that in the case at bar might not even buy or hold shares in
other corporations except upon the assent of three fourths
of its shareholders. Sec. 1775, Stats. (1898). It is quite
strange if the power to buy in its own shares, the exercise of
which breaches its contract with its own shareholders dissent-
ing, can be exercised upon less authority. The corporation
shall have powers conferred by these statutes necessary or
proper to conduct the business or accomplish the purposes
prescribed by its articles, but no other or greater. Id. The
corporation may amend its articles so as to diminish its capi-
tal stock, but only in the manner provided by statute or in its
articles of incorporation. Sec. 1774.

Turning to the decisions of this court upon the question of
the power of a corporation to purchase its own stock, the first
is *Shoemaker v. Washburn L. Co.* 97 Wis. 585, 73 N. W. 333,
where there were no existing creditors and the shareholders
all consented to the transaction. This surely is no precedent
that such purchase may be made against the objection of a
shareholder. The next is *Calteaux v. Mueller,* 102 Wis. 525,
78 N. W. 1082, where it was decided that a tender of its
own shares to the corporation in discharge of a corporate debt,
where the secretary and business manager had agreed, when
the debt was contracted, to receive these shares in payment,
was not a good defense. This is certainly no precedent, and
it should not be necessary at this late day to say that broad
general rules stated in the opinion or written into the syllabus
of a case, where only this narrow question was before the
court, are not law, unless this court has rightfully and con-
stitutionally entered the field of legislation. The next case is
*Marvin v. Anderson,* 111 Wis. 387, 87 N. W. 226, where all
the shareholders and directors acquiesced in the transaction
and treated it as valid for nearly two years. This is no prece-
dent for holding that the purchase may be made against the

will of the other shareholders, although we find the same general dictum in this opinion and in the two cases of *Shoemaker v. Washburn L. Co., supra,* and *Calteaux v. Mueller, supra. Pabst v. Goodrich,* 133 Wis. 43, 113 N. W. 398, was also a case where the shares had been purchased in by the corporation with the acquiescence, if not with the express consent, of all remaining shareholders, and thereafter reissued as a stock dividend to the remaining shareholders. The statement in the opinion to the effect that a corporation has power to purchase its own shares is of course applicable to the facts there before the court only.

The appellants' attorneys cite to us the following: 10 Cyc. 760, 762; *Railway Co. v. Allerton,* 18 Wall. 233; *Madison, W. & M. P. R. Co. v. Watertown & P. P. R. Co.* 7 Wis. 59; *Clark v. Farrington,* 11 Wis. 306. I have not time to examine the cases cited in Cook on Corporations (6th ed.) §§ 309 to 312, but it seems to me that few, if any, of these cases go to the extent that the instant case does in permitting such purchase by the corporation. The case of *Dupee v. Boston W. P. Co.* 114 Mass. 37, cited by Cook, certainly does not, because that was in effect a sale of the corporate real estate to the shareholders in exchange for shares of stock and in no wise affected the power to pay dividends.

This is therefore a new question in this court and not controlled by precedent, and under our statutes, fairly construed, the directors of a stock corporation have no power, against the will of the shareholders, to pay out the corporate funds otherwise applicable to dividends for purchase of shares of the corporate stock; and in the case at bar, notwithstanding the differences between the president and secretary, the fears of the directors, or their good faith (which the court below was very liberal and charitable in finding on the evidence), such directors had no power or authority to divert the corporate assets from the payment of dividends for the purpose of purchasing shares, nor to so change the position of the plaintiffs

by the purchase of shares as this record shows they have done, nor to buy off the probable opposition of the rebellious or quarrelsome secretary by the purchase of his shares and so perpetuate themselves in control and prevent the secretary from voting with the other faction at the next ensuing corporate election. If we were to ask any practical business man whether these shares belonging to the estate of Potter were worth as much after this transaction as before, the answer would not be doubtful.

While there has heretofore been no decision in this state going as far as the instant case, there are no doubt some illy considered cases elsewhere which lend color of authority to the majority decision. I see no way to change this deplorable condition except to bear with patience such frauds until they have become so noteworthy and numerous as to bring about the downfall of the mistaken rules which fostered them or to call upon the legislature for relief.