Samuel I. Brown, Plaintiff in Error, v. Fire Insurance Company of Chicago, Defendant in Error.

Gen. No. 35,458.

Heard in the first division of this court for the first district at the October term, 1931. Opinion filed February 29, 1932.

HART E. BAKER, for plaintiff in error; GILBERT, ROM-MEL, BURGER & BAKER, of counsel.

FISHER, BOYDEN, BELL, BOYD & MARSHALL, for defendant in error; DAVID A. WATTS, of counsel.

MR. JUSTICE MATCHETT delivered the opinion of the court.

Plaintiff sued upon a promise to buy from the plaintiff stock in the defendant company at the sum of $50 a share. He filed a declaration in three counts, two of which alleged an offer of defendant to buy and acceptance by plaintiff. Defendant filed a demurrer to the declaration. Upon hearing of the demurrer the parties stipulated that "defendant was incorporated August 8, 1929, under an act of the General Assembly of the State of Illinois entitled 'An Act to Incorporate and Govern Fire, Marine and Inland Navigation Insurance Companies Doing Business in the State of

Illinois,' approved March 11, 1869, as subsequently amended, and has ever since remained incorporated thereunder, and that this fact should be taken into consideration by the Court as though it had been pleaded in the first two counts of the declaration.'' The court sustained the demurrer as to the first two counts. Plaintiff withdrew the third count, and was ruled to file an amended declaration instanter, but refused to plead further, and electing to stand upon the first two counts suffered an involuntary nonsuit. Judgment for costs was entered against him, which he seeks to reverse by this appeal.

The question presented is whether the promise of defendant insurance company was ultra vires; in other words, whether a corporation organized under the Insurance Act, Cahill's St. ch. 73, may lawfully contract to purchase shares of its own stock.

In England the rule seems to be that a corporation does not have this power, even if the articles of association expressly authorize the purchase. *Trevor v. Whitworth,* L. R. 12 App. Cas. 409; 1 Machen on Corporations (1908), sec. 628; 1 Morawetz on Private Corporations (2nd ed.), secs. 112–113; 2 Minnesota Law Review, pp. 456–460. The prevailing rule in the courts of this country is to the contrary, although the ruling has been questioned (2 Minn. Law Reviews 466), and a respectable minority of our courts follows the English rule. In Machen on Modern Law Corporations, vol. 1, secs. 626, 627 and 628, the purchase by a corporation of its own shares of stock is described as a ''subtle method'' of evading the rule against unauthorized reductions of capital stock although the author admits a majority of the American courts decline to follow the English rule provided the purchase is bona fide and does not endanger the claims of creditors. In Morawetz on Corporations, vol. 1, sec. 112, the author says in substance that no verbiage can disguise the fact that a purchase by a corporation of its

own shares of stock really amounts to a reduction of the assets of the corporation and that the shares do in fact remain extinguished at least until a reissue has taken place. The supposed dangers incident to the exercise of this power have led a number of the States to enact statutes expressly forbidding such contracts. 2 Fletcher, Cyclopedia of Corporations, sec. 1139, p. 2098. It is expressly forbidden a banking corporation organized under the national act. (U. S. Rev. Stats., sec. 5201.) The learned author of Thompson on Corporations (vol. 5, sec. 4075, p. 622), says that the majority rule seems to be ''emphatically opposed'' in the minority of the States (see also sec. 4076, p. 625), and it has been expressly held by the Supreme Court of Illinois that such an agreement cannot be enforced to the injury of creditors. (*Olmstead v. Vance & Jones Co.*, 196 Ill. 236.) Ordinarily, according to the majority rule, an insurance, like any other corporation, may purchase its own shares for a legitimate purpose, but it is sometimes prohibited from doing so by statute. (32 Corpus Juris, sec. 64, p. 1016.)

The reasons usually advanced against judicial approval of such a purchase are (1) that it violates the rights of creditors by decreasing the capitalization of the corporation; (2) that it violates the rights of non-assenting stockholders by decreasing the number of shares, thus giving added power to the majority stockholders at the expense of the minority; and (3) that it allows the corporation to reduce its capital stock by an indirect method.

Courts generally seem to hold that a corporation may accept its shares returned where an option to return was given at the time of original purchase.

The question of the power of a railway company in Illinois to make a valid agreement for the purchase of its own shares was considered in *Chicago, P. & S. W. R. Co. v. Marseilles*, 84 Ill. 145, where the Supreme Court of our State, referring to a plea which denied

the power of a corporation to make such a contract, said:

"We entertain no doubt that a railroad company may, for legitimate purposes, purchase shares of stock which have been issued to individuals. Such is believed to have been the general custom of such bodies, nor have we known the power to have been questioned. There is nothing in this plea to show that this purchase was not for legitimate purposes." A rehearing was granted in that case and a later opinion filed, which appears in the same volume at page 643. After reviewing cases from the jurisdictions of Ohio, New York, Maryland and Vermont, the court said:

"These authorities, we think, fully recognize the power of the directors of a company, when not prohibited by their charter, to purchase shares of stock of their company. . . .

"If it were shown that the purchase was made to promote the interests of the officers of the company alone, and not the stockholders generally, or if for the benefit of a portion of the stockholders and not all, or for the injury of all or only a portion of them, or if it operated to the injury of creditors, or would defeat the end for which the body was created, or if it was done for any other fraudulent purpose, then chancery could interfere. In such case *Melvin v. The Lamar Ins. Co.*, 80 Ill. 446, and other cases in chancery referred to in appellant's brief, would apply, but the defense cannot be made at law."

In *Chetlain v. Republic Life Ins. Co.*, 86 Ill. 220, the question whether a life insurance company had such power was considered. The opinion states: "There are numerous cases which hold that a corporation may do so and violate no duty to the stockholders, unless prohibited by its charter."

In *Clapp v. Peterson,* 104 Ill. 26, the question arose with reference to stock of the Illinois Land and Loan Company, a corporation which had been chartered by

an act of the legislature in 1867. The capital stock of $100,000 had been all paid in, and thereafter Clapp, a nonresident stockholder, surrendered 555 shares of stock to the company, in consideration of which the company executed to him a deed for two lots in Chicago of the value of about $55,000, and the stock which was at that time considered of par value, was canceled. Thereafter a creditor obtained a decree against the company and execution having been returned *nulla bona,* filed a bill in chancery to subject the property in the hands of Clapp to the payment of the decree. She obtained a decree in her favor, and upon appeal to the Supreme Court it was urged for reversal that a corporation might purchase its own stock in exchange for money or other property and hold, reissue or retire the same, provided such act was done in good faith, was an exchange of equal value and was free from all fraud, actual or constructive, the corporation being neither insolvent nor in the process of dissolution. The Supreme Court stated that to this statement must be added the further condition that the rights of creditors were not affected, but that the shareholders of a corporation were conclusively charged with notice of the trust character of its capital stock in favor of creditors; that as to it they could not occupy the status of innocent purchasers but were to all intents and purposes privies to the trust. The court further said:

"When, therefore, they have in their hands any of this trust fund, they hold it *cum onere,* subject to all the equities which attach to it. Thompson's Liability of Stockholders, sec. 13; *Wood v. Dummer,* 3 Mason, 312."

*Republic Life Ins. Co. v. Swigert,* 135 Ill. 150, is the case upon which the plaintiff most relies. The facts in brief were that on May 25, 1877, the State auditor filed his petition against the company under an act for the dissolution of insurance companies, approved

February 17, 1874. The corporation appeared on the same day, admitted the matters alleged in the bill, and without objection on its part a receiver was appointed. On December 1, 1877, the receiver presented a petition to the court in which it was set up that on June 11, 1873, the board of directors of the corporation passed resolutions to the effect that such of its stockholders as desired so to do might cancel all outstanding certificates of stock upon which 20 per cent has been paid, and that a new certificate to each stockholder for the number of shares at par represented by the 20 per cent already paid should be issued in place thereof; that the remainder of the stock should be held as unissued stock, subject to sale and issue, as the directors should deem best, but at par, and for cash, only, exclusive of expense and commissions. The petition alleged that a large number of subscribers surrendered their certificates of stock pursuant to the resolution, and that the receiver knew of no resources out of which he would be able to pay the balance of the liabilities of the company, unless the same could be collected from these stockholders and subscribers. He prayed for direction in the premises. The court entered an order authorizing and directing the receiver to institute such legal or equitable proceedings as he might be advised were necessary and proper against these subscribers and stockholders. The Republic Life Insurance Co. sued out a writ assigning error by the court in not dismissing the petition of the auditor as prayed for by the corporation. Section 6 of the charter of the company provided that the real and personal property of each individual stockholder should be held liable for any and all liabilities of the company to the amount of stock held or subscribed by him and not actually paid in, and that in case of loss exceeding the means of the corporation each stockholder should be liable to the amount of stock unpaid for held by him. The opinion of the court states:

"A corporation may, if it acts in good faith, buy and sell shares of its own stock. (*Chicago, Pekin and Southwestern Railroad Co. v. Marseilles,* 84 Ill. 145; *Same v. Same,* id. 643; *Chetlain v. Republic Life Ins. Co.,* 86 id. 220; *Clapp v. Peterson,* 104 id. 26.)" The opinion of the court further states that the surrender by the stockholders as heretofore described was in substance and in legal effect a purchase by the company of the unpaid stock at its par value and that the transaction was not ultra vires; that the transaction was binding upon the company and the stockholders, and that the stockholders should be protected against further payments "unless there were, at the time of such transaction, existing creditors in respect to whose rights it was fraudulent." It was held that the order of the circuit court of January 31, 1878, authorizing the receiver to institute proceedings against the subscribers and stockholders, was erroneous and that part of the decree was reversed, while in other respects affirmed.

In *Roush v. Illinois Oil Co.,* 180 Ill. App. 346, it appeared that in a contract for sale of its stock by a corporation there was a provision for a repurchase of the same by the corporation on demand of the purchaser. It was contended that this agreement to repurchase its shares was ultra vires, but this court held that even if it was ultra vires, the defense could not be successfully interposed because the contract had "in good faith been fully performed by the other party, and the corporation has had the benefit of such performance." *Kadish v. Garden City Equitable Loan & Bldg. Ass'n,* 151 Ill. 531; *Lurton v. Jacksonville Loan & Building Ass'n,* 187 Ill. 141, and *Republic Life Ins. Co. v. Swigert,* 135 Ill. 150, were cited. The court further said:

"But the contracts in question are not obnoxious to the objection that they are ultra vires. A corporation may, if it acts in good faith, buy and sell shares of its

own stock. *First Nat. Bank of Peoria v. Peoria Watch Co.,* 191 Ill. 128; *Republic Life Ins. Co. v. Swigert;* 135 Ill. 150; *Clapp v. Peterson,* 104 Ill. 26; *Chicago, P. & S. W. R. Co. v. Town of Marseilles,* 84 Ill. 145.'' The opinion adds: ''The weight of authority in this country is in favor of the power of a corporation to purchase its own capital stock, except where the circumstances are such as to show that the purchase was fraudulent in fact, or that the corporation was insolvent, or in process or contemplation of dissolution at the time of such purchase. *U. S. Mineral Co. v. Camden & Driscoll,* 106 Va. 663; *Wisconsin Lumber Co. v. Greene & W. Tel. Co.,* 127 Iowa 350; *McIntyre v. E. Bement's Sons,* 146 Mich. 74; *Ophir Consol. Mines Co. v. Brynteson,* 74 C. C. A. 625, 143 Fed. 829; *Freemont Carriage Mfg. Co. v. Thomsen,* 65 Neb. 370; *Porter v. Plymouth Gold Min. Co.,* 29 Mont. 347.''

This review of Illinois cases shows that the courts of this State are committed generally to the rule that a corporation may, in the absence of charter or statutory restrictions, purchase its own stock provided it acts in good faith and is neither insolvent nor in process of dissolution, and provided such purchase is not prejudicial to the rights of its creditors or stockholders. (See *Gilchrist v. Highfield,* 140 Wis. 476, 17 Am. & Eng. Anno. Cases, 1257, with note thereto on page 1261.)

The defendant corporation contends that the statute under which it was organized by necessary inference forbids such a purchase. The defendant company is incorporated under the act approved March 11, 1869, as amended. (See Public Laws of Illinois, 1869, p. 209; Cahill's Ill. Rev. St. 1929, ch. 73, ¶ 127 *et seq.*) Section 4 of that act directs that the charter shall set forth the amount of the capital stock so to be employed in the business of the proposed corporation; section 6, that no such company shall be incorporated with a smaller capital than $100,000, actually paid in, in cash;

section 7, that the associated individuals may, upon the conditions named therein, open books for subscription to the capital stock of the company to be organized and keep the same open until the full amount specified is subscribed. Section 8 provides:

"That on and after July 1, 1909, any fire insurance company organized under this Act . . . for the purpose of investing its capital, surplus and other funds, or any part thereof, may purchase and hold as collateral security or otherwise, and sell and convey any bonds or public stock . . . or the capital stock, bonds, securities or evidence of indebtedness created by any corporation or corporation organized under the laws of the United States, or of this or of any state, except the stock of mining companies and except the stock of manufacturing companies . . .; *And, provided, further,* that no loans shall be made by any company on its own stock." Cahill's St. ch. 73, ¶ 136. Section 10 provides that the charter shall be examined by the superintendent of insurance and either he or three disinterested persons shall certify under oath that the capital has been paid in and is possessed by the company in money or in such stocks and bonds as are required by the eighth section of the act; that the corporators and officers shall also certify that the capital exhibited is the bona fide property of the company; that this certificate shall be filed in the office of the insurance superintendent, who shall thereupon deliver to the company a certified copy of the charter and of these certificates, which upon the same being filed in the office of the clerk of the county where the company is to be located, shall be their authority to commence business and to issue policies. Section 16 provides that the trustees and corporators shall be severally liable for all debts or responsibilities to the amount by him or them subscribed until the whole amount of the capital of such company shall have been paid in and a certificate provided. Section 18 makes

provision for the increase or decrease of capital stock or amendment of the charter after notice published of such intentions, with the written consent of three-fourths of the stockholders, unless otherwise provided in its charter, and filing a copy of the charter of the company, as amended, in the office of the Director of Trade and Commerce and upon the same proceedings had as required by the tenth section of the act.

Defendant contends that the provisions of the statute that require the capital stock named in the charter to be fully paid up before the corporation may engage in business, by necessary inference creates such capital stock to that amount a statutory "minimum" which cannot be purchased by the corporation. Defendant says that since the case of *Butler v. Walker,* 80 Ill. 345, these provisions have been uniformly construed to require the entire capital named in the charter to be fully paid in as a condition precedent to the lawful doing of business of the corporation; that this ruling was adhered to in *Gulliver v. Roelle,* 100 Ill. 141; *Diversey v. Smith,* 103 Ill. 378; *Gent v. Manufacturers' & Merchants' Mut. Ins. Co.,* 107 Ill. 652, and *People v. Mackey,* 255 Ill. 144. These cases in substance hold that although the amount of the capital named may be as low as $100,000, still if the charter names a larger amount it must all be paid in before the company begins business. (See also *Tibballs v. Libby,* 87 Ill. 142; *Weidenger v. Spruance,* 101 Ill. 278, and *Arenz v. Weir,* 89 Ill. 25.)

Defendant argues that since the whole amount of the capital stock must be fully paid up before the corporation may lawfully begin business, this is in effect its "statutory minimum capital stock," and that if the corporation might contract to purchase this stock, the entire purpose of the statute could be defeated. Defendant says diligent search discloses "no court has ever held that a corporation may purchase its own shares when such purchase will reduce its capital be-

low the minimum statutory amount." Defendant says that the existence of a surplus, the disposition to be made of the stock purchased, and the danger to creditors are all immaterial; that since the legislature has fixed a minimum capital stock to the amount named in the charter, the purchase of one share of this stock reduces that minimum. In support of this theory it cites a few cases from other jurisdictions, evidently relying much on *Crandall v. Lincoln,* 52 Conn. 73. That case discloses a bill in equity brought by the receivers of a trust company against a number of former stockholders who had sold their shares of stock to the company and who had been paid for the same out of its capital. The trust company in question was incorporated by an act of the General Assembly in 1871. Its charter gave it the power to receive money in trust and on deposit, and one of the sections provided that all the capital stock and property of the corporation should be charged with the fulfillment of these trusts and the payment of the deposits. The court held that the capital stock could not be divided among the stockholders to the prejudice of the creditors—a proposition which we think practically all the cases hold. The opinion states:

"The statute fixing the minimum number of shares and their par value determined as far as practicable the minimum value of the capital stock, and it was clearly the intention of the legislature that it should be no less. The number of shares, therefore, could not be reduced, and the value of the shares diminished, except by legislative authority. If the trustees could purchase stock with the capital of the corporation, they could of their own authority reduce the number of shares and correspondingly diminish the aggregate value of all the shares. Again, if they may purchase any of the stock, they may purchase all of it, and thus divide all the stock among the stockholders."

The statute under which the proceeding was brought there was essentially different from that under which this defendant corporation was organized. Moreover, the proceeding was by a receiver in behalf of creditors who had been defrauded by the sale and purchase of the stock. In this State our courts would have held, under similar circumstances, that the creditors might not be thus defrauded. The statement is mere dictum. Indeed, the lengthy opinion in another part states, "It may be allowable for a company to purchase stock temporarily *with its surplus.*"

Defendant also cites *German Savings Bank v. Wulfekuhler,* 19 Kan. 60, and *Abeles v. Cochran,* 22 Kan. 405. In each case, however, the Kansas statute which forbade the purchase of its own stock by a banking corporation except under particular circumstances, which did not exist in either case, was involved. In the *German Savings Bank v. Wulfekuhler* case, the court said:

"A bank cannot purchase its own stock, except in some few cases for the purpose of securing some previously-existing debt. . . . For a bank to use its funds in the purchase of stock is to withdraw that much of its capital from legitimate banking business; and to purchase its own stock is in effect a withdrawal of that much of its stock from actual existence, and in that way the bank might reduce the amount of its capital stock below the amount required by law, (towit, $50,000; Gen. Stat. 225, sec. 128), and might also impair or even destroy all security given by law to the creditors of the bank." This may have been true under the facts which there appear. It is not true under the facts disclosed by the record before us. The law under which defendant is incorporated does not impose a double liability on stockholders. There is nothing here from which even an inference may be drawn that the purchase of these shares would reduce

the capital stock below what defendant calls the "irreducible minimum." For aught that here appears, defendant may have surplus funds from which the purchase price of the stock will be paid. The contract of purchase does not carry with it the obligation to cancel the stock. In *Republic Life Ins. Co. v. Swigert, supra,* there was an "irreducible minimum" of capital stock required by statute for the corporation involved, although the statute applicable did not require that all of the stock should be paid in before the corporation might begin to do business, but the capital stock of every corporation for profit, whether paid or only subscribed, is a trust fund for the payment of the debts of the corporation. *Coleman v. Howe,* 154 Ill. 458; *Central Illinois Pub. Service Co. v. Swartz,* 284 Ill. 108.

Defendant here did not file any plea tending to show that the purchase of this stock would result in reducing the capital stock below what it calls the "irreducible minimum," or that it would injure any creditor or result in any injustice to any stockholder. In the absence of a plea of this nature, we cannot assume that such would be the result in view of the long line of decisions in this State which hold to the contrary. Under the theory adhered to by the courts of this State, in the absence of unfair dealing or fraud of some kind, there is no reason why a corporation cannot purchase all its own stock and retire from business and by this method distribute its assets to its stockholders. The federal courts have expressly held it may. *Mannington v. Hocking Valley Ry. Co.,* 183 Fed. 133.

In the second place, defendant contends that section 8 of the Fire Insurance Statute, Cahill's St. ch. 73, ¶ 136, by prohibiting the defendant company from making any loans on its own stock, necessarily prohibits the company from purchasing such stock, and that plaintiff's argument that the language of section 8 permitting the purchase of the stock of any cor-

poration covers its own stock reduces the statute as a whole and its purpose, as declared by the Supreme Court of Illinois, to an absurdity. Defendant says that the provision of section 8 which forbids loans upon a company's own stock is a stricter prohibition than that imposed by those jurisdictions which forbid the purchase by a company of its own shares, pointing out that in such jurisdictions a corporation may usually take its own stock as collateral security, and it cites authorities such as *Dalzell v. Commercial Bank,* 82 Mo. App. 264; *Bear Creek Lumber Co. v. Second Nat. Bank of Cumberland,* 120 Md. 566; *Coppin v. Greenlees & Ransom Co.,* 38 Ohio St. 275; 2 Fletcher Cyclopedia of Corporations, sec. 1142; 5 Thompson on Corporations (3rd ed.), sec. 4089, and 1 Machen on Corporations (1908), sec. 638. The cases cited do not sustain the proposition. *Harker v. Relston Purina Co.,* 45 F. (2d) 929. Defendant also again cites *Crandall v. Lincoln,* where in the construction of the statute under which the corporation in that case was organized, the court said that a clause of the statute which forbade the declaration of dividends except from earnings, etc., adding, "Nor make any loan or discount on a pledge of its own stock," "By necessary implication forbids the company from purchasing its own stock."

We have already shown how the facts of that case, as well as the law under which the corporation was organized, distinguish it from this. The point made, of course, in the last analysis depends upon the construction to be given to section 8 of the Fire Insurance Statute. If it had been the intention of the legislature to prohibit the purchase by a fire insurance corporation of its own stock, it seems strange indeed that appropriate language to convey that thought was not used. The question of policy seems to have been considered by the legislature with reference to life insurance companies in 1907, Cahill's St. ch. 73, ¶ 368;

Smith-Hurd's Ill. Rev. Stats. 1931, ch. 73, par. 258, p. 1693. That paragraph expressly forbade the purchase by a life insurance company of stock in any *other* life insurance company, thus by clear implication allowing it to make a purchase of its own stock. Although that act was amended as late as July 7, 1931 (Laws of Illinois 1931, p. 640), it does not appear that any change was made in this respect. Paragraph 23 of chapter 73 was also amended on that date, Cahill's St. ch. 73, ¶ 136 (Smith-Hurd's Ill. Rev. Stats. 1931, p. 1649), and the securities in which a fire insurance company might or might not invest its funds seem to have been carefully enumerated. It is significant that there is no provision which forbids the purchase by such a corporation of its own stock. The prohibition that it make *no loans* on its own stock is, however, retained.

Defendant asserts that making a loan is a less serious act and of the same nature as the purchase by a company of its own stock. If that question may be considered as for the courts, we would hold otherwise for many reasons. A corporation does not get title to stock which it takes as collateral, and in case default is made on a loan thus secured it would be required to follow strictly a long and highly involved technical procedure to foreclose its loan. This danger alone may well have been the reason which induced the legislature to enact this restriction. It would seem to be hardly necessary to point out the many respects in which an absolute purchase may be distinguished from a loan upon collateral. We may not assume that the legislature was not able to discern these distinctions nor that if it had been its intention to forbid the purchase of its own stock by such a corporation, it would have failed to forbid it in plain and unambiguous language. The judicial department of the government is not permitted to usurp the functions of the legislative

department. We have the right and it is our duty to interpret an act passed by the legislature, but we have no power or authority to rewrite it. The question of policy is for the legislative rather than for the judicial department of the government. The entire matter is one which we think is for legislative discretion. Whether public and private interests would be best served by a rule absolutely forbidding a corporation to deal in or purchase its own stock is for the legislature to determine. That such purchases make possible frauds upon creditors, minority stockholders and others, are facts recognized in the decisions of the courts of our State which hold that equity will always grant relief in such cases. The reasoning upon which other courts have denied the right of a corporation to purchase its own stock has not met with the approval of the courts of Illinois. *Republic Life Ins. Co. v. Swigert,* 135 Ill. 150, and other Illinois cases cited, are decisive. If it had been the intention of the legislature to change the long established rule and enact a contrary one, we may not doubt language would have been used so clear and unambiguous that no construction by inference would be necessary.

We hold that the court erred in sustaining the demurrer and in entering judgment against plaintiff, and for these errors the judgment will be reversed and the cause remanded with directions to the trial court to enter a rule upon the defendant to plead to plaintiff's declaration.

*Reversed and remanded with directions.*

O'CONNOR, P. J., and McSURELY, J., concur.